**MALLEY–DUFF & ASSOCIATES, INC., a corporation**

v.

**CROWN LIFE INSURANCE COMPANY, a Corporation; Agency Holding Corporation, an Illinois Corporation; Agency Holding Corporation, an Ohio Corporation; Clarke Burton Lloyd, an individual; Kerry Patrick Craig, an individual; and Ellie M. Goldstein, an individual.**

Appeal of Kerry Patrick CRAIG in Nos. 83–5396 and 83–5406.

**MALLEY–DUFF & ASSOCIATES, INC., a corporation**

v.

**CROWN LIFE INSURANCE COMPANY, a Corporation; Agency Holding Corporation, an Illinois Corporation; Agency Holding Corporation, an Ohio Corporation; Clarke Burton Lloyd, an individual; Kerry Patrick Craig, an individual; and Ellie M. Goldstein, an individual.**

Appeal of CROWN LIFE INSURANCE COMPANY and Clarke Burton Lloyd in No. 83–5397.

**MALLEY–DUFF & ASSOCIATES, INC., a corporation, in No. 83–5427,**

v.

**CROWN LIFE INSURANCE COMPANY, a Corporation; Agency Holding Corporation, an Illinois Corporation; Agency Holding Corporation, an Ohio Corporation; Clarke Burton Lloyd, an individual; Kerry Patrick Craig, an individual; and Ellie M. Goldstein, an individual.**

Nos. 83–5396, 83–5397, 83–5406 and 83–5427.

United States Court of Appeals, Third Circuit.

Argued March 5, 1984.

Decided May 7, 1984.

Rehearing and Rehearing In Banc Denied June 4, 1984.

136

John H. Bingler, Jr. (argued), Glenn E. Bost, II, Michael R. Bucci, Jr., Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellant, Kerry Patrick Craig, in Nos. 83–5396 and 83–5406.

Alexander Black (argued), Ramona J. Rokoski, Robert W. Brown, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for appellants, Crown Life Ins. Co. and Clarke Burton Lloyd, in No. 83–5397.

H. Woodruff Turner (argued), David A. Borkovic (argued), Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for appellant, Malley-Duff & Associates, Inc., in No. 83–5427.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and LATCHUM, District Judge.*

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Two major questions are presented in these cross-appeals from a judgment entered on a jury verdict in favor of Malley-Duff & Associates, Inc. In the appeal at No. 83–5427, we must decide whether the trial court erred in directing an adverse verdict on Malley-Duff's antitrust claim that alleged a collective refusal to deal (boycott) in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. In the appeals at Nos. 83–5396, 83–5397, and 83–5406, our primary task is to determine whether a new trial should be granted based on an inconsistency in the jury's verdict on state common law claims. Subsidiary issues involve several questions relating to admissibility and sufficiency of evi-

dence and alleged errors in jury instructions.

Malley-Duff, a Pittsburgh-based general insurance agency, charged that Crown Life Insurance Company, a Canadian life insurance carrier; Clarke Lloyd, its former vice president in charge of United States general agencies; Kerry Craig, a former Crown employee; and Agency Holding Corporation, a multi-state general agency representing Crown Life in the United States, all participated in a *per se* group boycott against it in violation of § 1 of the Sherman Act. It also alleged that the defendants were liable under Pennsylvania common law because they conspired to tortiously interfere with Malley-Duff's Pittsburgh general agency contract with Crown Life and tortiously interfered with the contract. At the close of plaintiff's case, the district court directed a verdict for the defendants on the Sherman Act claim. After the close of all evidence, the jury found the defendants liable under one of the common law conspiracy charges and assessed damages of $900,000.00. All parties have appealed. We conclude that there was sufficient evidence on the antitrust claim to preclude a directed verdict and that the verdict form answers on the remaining state law claims were inconsistent. We, therefore, reverse the judgment of the district court and remand for a new trial.

### I.

At trial, Malley-Duff presented a theory that Lloyd, while in charge of United States general agencies for Crown Life, masterminded a scheme to create the Agency Holding Company in conjunction with Craig to take over a number of Crown Life territories, and that, *inter alia*, they intended to freeze Malley-Duff out of the Crown Life insurance business in Pittsburgh and replace it with an agency controlled by their interests. To evaluate the various contentions, it is necessary to set forth in some detail the evidence presented

---
* Honorable James L. Latchum, of the United States District Court for the District of Delaware, sitting by designation.

at trial. To the extent that the antitrust claim was terminated by a directed verdict, we invoke the familiar rule that we "consider the record as a whole and in the light most favorable to the non-moving party, drawing all reasonable inferences to support its contentions." *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 883 (3d Cir.) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 115 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

Malley-Duff presented direct and circumstantial evidence substantially as follows. In terms of insurance in force, Crown Life, located in Toronto, ranks in the top two percent of all life insurance companies operating in North America. At the time of the relevant events, Crown marketed its products in the United States through independent general agents, with agency contracts providing for commissions generally exceeding those offered by other life insurance companies.

The Malley-Duff agency was the oldest of seven Crown Life general agencies in Pennsylvania and represented Crown Life continuously and exclusively until its termination for a period of 23 years. The agency contract contained a 30-day termination clause. Malley-Duff did not have an exclusive franchise for Pittsburgh, Pennsylvania, but competed with the Jules Ehrman Agency, a brokerage and personal producing general agency, for the sale of Crown Life products in the area. Malley-Duff sold insurance through independent agents who, in turn, dealt with consumers. The Ehrman Agency engaged in both personal production and brokerage sales. Notwithstanding this competition, Malley-Duff produced over $58,400,000 in business for Crown Life in the Pittsburgh area from 1967 to 1977.

Employed by Crown Life Insurance Company for over 30 years, Lloyd rose to the position of Senior Agency Vice-President for the United States. From at least 1976 until 1981, Crown Life vested Lloyd with complete and unfettered power to appoint and terminate general agents and to approve loans and financing for them.

Kerry Craig began with Crown in 1969 when he was only 21-years-old. For three years, he operated Xerox machines, but then was transferred to Lloyd's Agency Department where he served two years as a messenger until 1974. About a year later, Lloyd promoted the former Xerox operator and messenger to be a Supervisor of Agencies where he remained for two years until he left Crown Life to serve as the head of Agency Holding Corporation, which was formed in 1977 pursuant to Lloyd's instructions. Agency Holding became Crown Life's general agent in Chicago. Plaintiff contended that Lloyd and Craig controlled Agency Holding and used it to own and control general agencies in various parts of the United States, including Pittsburgh.

The creation of Agency Holding followed an interesting scenario. In October 1976, Crown Life's general agent in Chicago died. Lloyd, responsible for finding a replacement, revealed a plan to a friend, Dennis Cunningham, whose aid he attempted to enlist. Lloyd divulged that he was forming a "mega general agency holding corporation." App. at 1505a–06a. Beginning in Chicago, Cleveland, Pittsburgh and Toledo, this mega general agency holding corporation was designed to control Crown Life's general agencies throughout the eastern United States. Plaintiff contended that the plan called for Craig and Robert Oglevee to join Lloyd in the operation, and Lloyd extended an invitation to Cunningham who declined to join.

Lloyd engaged Bruce Pennamped, an attorney in Indianapolis, Indiana, to incorporate Agency Holding Corporation in Illinois. Plaintiff contended that Pennamped was a nominee for Lloyd and Craig and that he was to front for Agency Holding until Craig, a Canadian national, received immigration permission to be employed in the United States. An indemnity agreement dated February 28, 1977, between the attorney and Crown sets forth Pen-

namped's duties more fully. Lloyd hired him to "assist in the organization, management, operation and financing of certain of [Crown Life's] general agencies located, or to be located, in Chicago, Illinois; Cleveland, Ohio; and, Pittsburg [sic], Pennsylvania ...." App. at 2616a; Supp.App. at 635a–36a. Pursuant to Lloyd's instructions, Pennamped made arrangements in January 1977 for Agency Holding to be qualified to do business in Ohio and Pennsylvania.

On February 11, 1977, Lloyd and Craig met with Chicago insurance executive Ralph Wood and offered Wood a position with Agency Holding. Lloyd explained that Agency Holding would be the new Chicago general agent and that it would control ten or twelve territories throughout the East, including Cleveland and Pittsburgh. Four or five vice-presidents were to be appointed and were to split 20 percent of the Agency Holding stock. Lloyd refused to divulge the identity of the 80 percent shareholder, and Mr. Wood declined the offer.

In March 1977, Crown Life, through Lloyd, appointed Agency Holding as its Chicago general agent. Pennamped continued to be the nominal head of Agency Holding although he seldom visited Chicago.

In early 1977, Lloyd terminated Crown Life's general agent in Cleveland, and awarded a new general agency for Cleveland to the newly formed Agency Holding Corporation of Cleveland, Ohio. Oglevee was the president of Agency Holding-Ohio, but Craig, still employed by Crown Life, was the majority stockholder, although there was evidence that he contributed no capital for his majority interest. Ed Horning was employed as manager and Lloyd promised him (but never delivered) 40 percent of the stock, while 20 percent was to be held by "silent partners." Supp.App. at 709a–10a. Plaintiff produced testimony that neither Craig nor Oglevee ever made a real business decision affecting any agency without first consulting Lloyd.

On July 12, 1977, the Immigration and Naturalization Service granted Craig permission to work in this country. Three days later, Craig resigned from Crown Life effective September 1, 1977 and became the company's general agent in Chicago and Cleveland. He was just three years away from his position as messenger and Xerox operator at Crown Life.

Lloyd and Craig traveled to Pittsburgh in August 1977 and met with the principals of Malley-Duff. At that meeting, Lloyd professed dissatisfaction with Malley-Duff's production, which had exceeded $5,000,000 in 1976. He delivered an ultimatum: Malley-Duff would be terminated unless it met a production quota; moreover, Crown Life was either going to establish a new general agent in Pittsburgh or to expand the Ehrman Agency.

The quota Lloyd imposed upon plaintiff in August 1977 required Malley-Duff to produce $7,500,000 of business by December 31, 1977, the year then in progress. Less than four months remained in the appropriate business year when plaintiff learned that it had to produce 50 percent more of its business than it did the entire preceding year.

Evidence disclosed that Malley-Duff had never had a quota before, that Crown Life had never imposed a yearly quota upon any agency over nine months into the year to which it applied, and that Crown Life had never terminated a general agent producing more than $5,000,000 in business. Crown Life's internal documents disclose that 78 percent of Crown Life's United States general agencies did not produce $7,500,000 in 1977. Malley-Duff's 1977 production had placed it in the top third of all of Crown Life's 1977 general agents in the United States. Moreover, Malley-Duff was told that it had to produce $10 million in 1978, $15 million in 1979, and $20 million in 1980, an increase of 300 percent in four years.

Lloyd admitted that he did not expect Malley-Duff to meet the quota. App. at 1661a. In August 1977, Oglevee told another general agent that he and Craig

would take over Malley-Duff when it was terminated. He and Craig also agreed that their Pittsburgh venture would be more profitable if Malley-Duff were eliminated. Lloyd, Craig and Oglevee met with Mr. Ehrman in December 1977 to negotiate the acquisition of the Ehrman Agency.

Although Malley-Duff's 1977 production exceeded that of 1976, it fell short of the quota. On January 11, 1978, Crown Life mailed plaintiff a formal 30-day termination notice and, on February 13, 1978, Malley-Duff's business was transferred to the Ehrman Agency. Craig and Oglevee signed the formal purchase agreement for the Ehrman Agency and named the new agency Ehrman, Ratini, Oglevee & Craig (EROC), although Ehrman and Ratini were not owners. Craig and Oglevee and, according to plaintiff, also Lloyd, then had Crown Life's sole remaining franchise in Pittsburgh.

Direct evidence as to the true ownership of Agency Holding was not forthcoming at the trial, although there were permissible inferences that could have been drawn by the jury. At the time Craig was appointed general agent for Chicago, he admitted to one of Crown Life's officers that he owned only "part" of the holding company. He later admitted to another that he owned 20 percent of Agency Holding and refused to identify the majority owner. Crown Life investigated the matter but was not able to determine the real owner of Agency Holding. Lloyd refused to disclose the information to Crown Life's other senior officers, claiming the matter was confidential.

The evidence showed that Lloyd had control over the granting and withholding of loans and advances from Crown Life to general agents in the United States. As soon as Agency Holding obtained a Crown Life franchise, Lloyd authorized large loans and advances for that agency that were unlike any Crown financing before or since. Crown Life funneled between $5,000,000 to $8,000,000 to Agency Hold-

ing. Lloyd left Crown Life in October 1981 and moved into Craig's Chicago apartment and took over Craig's office at Agency Holding. Lloyd then assumed control over and management of Agency Holding.

The present litigation followed these events. Malley-Duff charged that defendants conspired in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[1] It further charged that defendants were liable under Pennsylvania law for tortious interference with the Malley-Duff/Crown Life general agency contract and for conspiring to tortiously interfere with that contract. Directing a verdict on the antitrust claim at the close of plaintiff's case, the district court allowed the Pennsylvania common law claims to go to the jury. The jury returned a $900,000.00 verdict for Malley-Duff on the conspiracy claim but concluded there was no tortious interference. Malley-Duff appeals from the adverse ruling on the antitrust claim and defendants appeal, attacking, *inter alia*, the jury verdict.

## II.

■ We turn first to Malley-Duff's contention that the district court erred in adversely directing a verdict on its antitrust claim. Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Courts have narrowed the apparent scope of § 1 and have concluded that it precludes only those contracts or combinations that "unreasonably" restrain competition. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Generally, a "rule of reason" analysis is employed to determine whether § 1 has been violated. Under this analysis, a plaintiff must show anticompetitive effect in the relevant product and geographic markets. *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413

---

1. Malley-Duff also alleged violations of § 2 of the Sherman Act and § 7 of the Clayton Act. Because Malley-Duff has not appealed the ad-

verse directed verdict as to these counts, we do not address them here.

(1978). The Supreme Court has stated, however, that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific*, 356 U.S. at 5, 78 S.Ct. at 518. Activities that have been treated as *per se* illegalities are price fixing, resale price maintenance, group boycotts, tying arrangements, and certain types of reciprocal dealing. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir.1979) (citing cases).

Malley-Duff proceeded at trial under a group boycott theory. In directing the verdict, the district court held that there was no evidence from which a jury could conclude that defendants had violated Sherman § 1 under either a "rule of reason" analysis or a *per se* violation theory. App. at 30a.

### A.

◼ The district court determined that no antitrust offense could be established without proof that the alleged anticompetitive conduct adversely affected consumers. App. at 27a–30a. The court relied on *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Co.*, 682 F.2d 660 (7th Cir.1982), and concluded that the claim had to fail because antitrust laws are designed to protect consumers and determined that "[t]hough Ehrman and Malley-Duff may have competed with each other, it was not competition which would affect the consumer." App. at 30a. It is settled, however, that when a party is proceeding on the basis of a *per se* violation, "it [is] not for the courts to decide whether in an individual case [public] injury had actually occurred." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 211, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). The district court clearly erred in focusing on impact on consumers in determining there was no *per se* violation. We have previously empha-

sized that a group boycott, a *per se* violation, is made out where there is concerted action with "a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." *De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1318 (3d Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975).

We also note that to the extent the district court further relied on *Products Liability* in making its determination that a *per se* violation was not established, its reliance was misplaced. *Products Liability* involved a fact situation similar to the instant case. There, an insurance broker alleged that an insurance company and agency conspired to exclude it from the product liability insurance business. 682 F.2d at 662. In determining whether a § 1 violation had been made out, the Seventh Circuit, speaking through Judge Posner, noted that "[t]o prove that a conspiracy or other form of agreement violates section 1 of the Sherman Act, the plaintiff must show *either* that it falls in one of the categories of 'per se' illegality *or* that it has an actual or at least probable anticompetitive effect." *Id.* at 663 (emphasis added). We have no quarrel with this. The court then noted that illegal *per se* agreements are for the most part horizontal and that vertical agreements are illegal *per se* only if their purpose is price fixing. *Id.* It concluded that the alleged agreement was vertical, and hence a *per se* violation could not be shown because there were no allegations of price fixing. It is at this step in the Seventh Circuit's reasoning that we part company.

◼ In *Cernuto*, this court, through Judge Adams, observed that

> if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is

horizontal and on the dealer, not the manufacturer, level.

595 F.2d 164, 168 (3d Cir.1979). In the case before us, Malley-Duff has alleged an agreement among insurance sellers— Lloyd, Craig, and Agency Holding, all competitors of Malley-Duff in the insurance sales business—who conspired among themselves, and indirectly assisted by Crown Life, to freeze their competitive seller out of the Crown Life insurance market; an agreement that produced an impact on the horizontal level. Plaintiff's theory seems congruent with the observation in *Cernuto*. We conclude, therefore, that in light of our own precedent, the *Products Liability* characterization of such an agreement as a vertical restraint is not binding and does not foreclose inquiry as to whether defendants' alleged agreement may have constituted a *per se* violation where its principal impact was felt on the horizontal level. Hence, *Products Liability* does not defeat Malley-Duff's right to go to the jury on the theory of group boycott, which has long been regarded as a *per se* violation. *See United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

Because Crown Life, Agency Holding, Lloyd and Craig argue that other reasons may support the district court's conclusion that there was no *per se* violation, we now turn to ruling case law on group boycotts to evaluate the evidence in the light most favorable to Malley-Duff.

#### B.

The Supreme Court has recently reminded us that

there is the basic distinction between concerted and independent action—a distinction not always clearly drawn by parties and courts. Section 1 of the Sherman Act requires that there be a "contract, combination ... or conspiracy" between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.

*Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (52 U.S.L.W. 4341, 4343, 1984) (citations omitted). In seeking affirmance of the directed verdict, appellees argue that there was insufficient evidence of concerted action here, that Crown Life had a right to refuse to deal with Malley-Duff, and that it terminated the agency as a result of an independent marketing decision. They argue that Crown Life had the power to change agents in Pittsburgh without subjecting any of the appellees to antitrust law violations. We understand this argument completely. Previous decisions of this court have carefully made the distinction, emphasized by the Supreme Court in *Monsanto*, that a termination decision prompted by concerted action is different than one emanating from independent action. *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3d Cir.1972). We understand appellees' argument that there must be "something more" than simply a unilateral termination before it is considered illegal. More ingredients must be added to the factual mix before the termination goes beyond the pale of legality and becomes a prohibited act under antitrust law. We therefore must examine these additional ingredients.

"[W]here the refusal to deal is not unilateral but rather is prompted by an understanding with other parties, an antitrust violation may be found, either by application of a *per se* rule or through a 'rule of reason' analysis." *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 142 (3d Cir.1978) (footnotes omitted). Thus, it has been held where dealers induced General Motors to pressure recalcitrant automobile dealers not to deal with discounters, the Supreme Court noted that the fact that the restraints were induced by dealers seeking to choke off competitors at their level was sufficient to constitute a *per se* violation. *United States v. General*

*Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In comparison, this court found no such violation in another automobile dealership case that turned on different facts. In *De Filippo v. Ford Motor Co.*, 516 F.2d 1313 (3d Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975), we concluded that plaintiffs "were not deprived of the opportunity to become a Ford dealer or to purchase products on the same basis as other dealers. They were deprived simply of the benefits of a contract offered to them at special terms. Such a deprivation, even if the product of a concerted action, does not violate § 1 of the Sherman Act." 516 F.2d at 1320–21. As explained in *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 670 F.2d 421, 430 (3d Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982), this court "is among those that have attempted to limit the application of the *per se* rule to the 'classic' boycott." We repeat for the purpose of emphasis that a boycott is made out where there is concerted action with "a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." *De Filippo v. Ford Motor Co.*, 516 F.2d 1313 at 1318. These cases teach, therefore, that although a unilateral decision to refuse to deal is not in and of itself a violation of the antitrust laws, if the decision is not purely unilateral but is the product of competitors working in concert with themselves or in conjunction with the company to exclude a person or a group from the market, the necessary elements of a boycott in the classical sense may be present, and hence a § 1 violation may be made out. As we see it, this was the plaintiff's theory advanced at trial.

### C.

We now must decide if adequate factual elements were presented to the jury to support plaintiff's theory of a classic group boycott. We embark on this analysis mindful of the Supreme Court's latest admonition that

> [t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. As Judge Aldisert has written, the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons*, [637 F.2d 105] at 111 [ (3d Cir.1980), *cert. denied*, 451 U.S. 911 (1981)]; accord *H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (CA2 1981) cert. denied 459 U.S. 880 (1982); cf. *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (Circumstances must reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement").

*Monsanto Company v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (footnote omitted).

Applying this standard to the facts of this case, we believe there was sufficient evidence for the jury to conclude that Agency Holding, Craig, and Lloyd were competitors who were parties to concerted action among themselves and with Crown Life to terminate Malley-Duff. There was substantial direct evidence as well as circumstantial evidence to sustain plaintiff's theory.

We deem the following circumstances to be important. At relevant times, Lloyd represented not only himself, but Crown Life as well. Lloyd was the senior agency vice-president for the United States with complete power to appoint and terminate general agents and to approve loans and financing for them. Many Crown Life decisions that directly related to Malley-Duff were made by Lloyd on behalf of his employer. This principal-agent relationship

cannot be seriously controverted. Thus, under certain circumstances he acted for Crown Life; under others, he acted for himself. By February 28, 1977, Lloyd hired attorney Pennamped to organize Agency Holding Company, a mega general agency, and that Pennamped was to assist in organizing, managing, operating and financing general agencies to be located at various places in the United States, including Pittsburgh. There was sufficient evidence to support the inference that Lloyd had a financial interest in Agency Holding. There was circumstantial evidence suggesting that Craig, woefully inexperienced in the general agency field, was but a figurehead for Lloyd. Plaintiffs contended that Craig was not licensed to sell insurance in any state. Brief for appellant at 12 n.5. There was sufficient evidence for a jury to conclude that the imposition of quotas on Malley-Duff by Lloyd and Crown Life was a contrived device to terminate Malley-Duff: requiring the agency to increase a year's production by 50 percent within the short space of four months; imposing quotas of $10 million in 1978, $15 million in 1979, and $20 million in 1980 at a time when 78 percent of Crown Life's United States general agencies did not produce $7,500,000 in annual business and also at a time when Malley-Duff's 1977 production had placed it in the top third of these general agencies. There was testimony that before the year ended Oglevee said that he and Craig would take over Malley-Duff when it was terminated and that the Agency Holding venture would be more profitable if Malley-Duff were eliminated. Lloyd, Craig and Oglevee all participated in negotiations to acquire the Ehrman Agency and when this came to fruition, Oglevee and Craig were named principals in the new agency. Finally, in his capacity as a senior vice-president at Crown Life, Lloyd caused from $5,000,000 to $8,000,000 to be funneled as loans from Crown Life to Agency Holding, the organization which he headed publicly after being discharged by Crown Life.

This direct and circumstantial evidence was more than sufficient to show "a con-scious commitment to a common scheme designed to achieve an unlawful objective." The direct and circumstantial evidence support what this court has described as a classic group boycott: concerted action by competitors to exclude Malley-Duff from the market. This was not a simple unilateral action by a company to terminate a dealer as set forth in *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3d Cir.1972). Unlike *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), where there was no evidence that Texaco decided to terminate Sweeney because of complaints of competitors and no evidence of concerted action, here there was more than adequate evidence of an unlawful conspiracy to freeze out Malley-Duff in favor of Agency Holding. There was sufficient evidence for a jury to conclude that Lloyd and Craig conspired (1) between themselves, (2) with Agency Holding, and (3) given Lloyd's role in Crown Life, with both Agency Holding and Crown Life to the extent that Crown Life imposed artificial quotas on Malley-Duff and funneled millions of dollars into Agency Holding by way of loans. For example, had Crown Life imposed artificial quotas on Malley-Duff *without more*, this would have been a mere unilateral act. But those quotas were imposed by Crown Life through their senior vice-president Lloyd, and there was direct and circumstantial evidence that they were imposed for Lloyd's ulterior cross-purpose to implement Lloyd's scheme with Craig and Agency Holding to freeze-out Malley-Duff from Crown Life. Moreover, Crown Life's funneling millions of dollars to Agency Holding cannot be evaluated *in vacuo;* it must be considered in conjunction with the same scheme. The result was a pincers movement: to mortally wound Malley-Duff and at the same time to replenish the coffers of Agency Holding, the mega-insurance agency that directly or indirectly was to replace Malley-Duff. The district court clearly erred in determining that

there was insufficient evidence to go to the jury on the *per se* group boycott claim.[2]

### D.

█ Appellees Crown Life and Lloyd argue that, in any event, they are immune from liability under § 1 of the Sherman Act because of the "insurance" exemption effected by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015. There is no merit to this contention. First, McCarran-Ferguson only exempts "the business of insurance," i.e., primarily the insurer-insured relationship, from the antitrust laws and not all the actions of insurers generally. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Second, the Act itself specifically excludes from the exemption "any agreement to boycott, coerce, or intimidate ...." 15 U.S.C. § 1013(b). Thus to the extent that Malley-Duff argues that appellees' conduct constituted a group boycott,

2. In the view we take it is unnecessary to consider the alternative rule of reason theory advanced by plaintiff at trial. Moreover, from our treatment of the antitrust issue here, a conclusion must necessarily follow that there was sufficient evidence to go to the jury on the common law conspiracy issue, thus rejecting contentions presented by Crown Life and Lloyd.

3. The verdict form, with the jury's responses noted by an "X," provides in relevant part:
 1. As to plaintiff's claim that all of the defendants other than Crown Life Insurance Company tortiously interfered with its contractual relationship with Crown Life Insurance Company, we, the jury, hereby find (make a separate finding as to each defendant listed):
 Agency Holding Corp. (of Illinois)-___liable; X not liable.
 Agency Holding Corp. (of Ohio)-___liable; X not liable.
 Clarke Burton Lloyd-___liable; X not liable.
 Kerry Patrick Craig-___liable; X̄ not liable.
 2. (A) As to plaintiff's claim that all of the defendants conspired to tortiously interfere with its contractual relationship with Crown Life Insurance Company, we, the jury, hereby find (make a separate finding as to each defendant listed):
 Crown Life Insurance Co.-X liable; ___not liable.
 Agency Holding Corp. (of Illinois)-___liable; X not liable.

appellees may not use McCarran-Ferguson as a shield.

### III.

We now turn to the contentions presented by Crown Life, Agency Holding, Lloyd, and Craig (hereinafter appellee-cross appellants) in their cross-appeals that a new trial should be granted because of inconsistent answers in the verdict form covering the claims brought under Pennsylvania common law.[3] The reply of Malley-Duff is twofold. It argues that appellee-cross appellants have waived any inconsistent verdict objection. Alternatively, Malley-Duff argues that there is no inconsistency in the answers.

█ We do not accept Malley-Duff's contention that appellee-cross appellants have waived the right to raise the inconsistent verdict issue. Malley-Duff argues that, based on the last sentence of Rule 49(b), F.R.Civ.P., the objection must be raised before the jury is discharged:

 Agency Holding Corp. (of Ohio)-___liable; X not liable.
 Clarke Burton Lloyd-X liable; ___not liable.
 Kerry Patrick Craig-X liable; ___not liable.
 (B) As to plaintiff's claim that all of the defendants conspired with the specific intent to inflict injury upon the plaintiff, we, the jury, hereby find (make a separate finding as to each defendant listed):
 Crown Life Insurance Co.-___liable; X not liable.
 Agency Holding Corp. (of Illinois)-___liable; X not liable.
 Agency Holding Corp. (of Ohio)-___liable; X not liable.
 Clarke Burton Lloyd-___liable; X not liable.
 Kerry Patrick Craig-___liable; X̄ not liable.
 GO ON TO QUESTION NO. 3 ONLY IF YOU HAVE FOUND ONE OR MORE OF THE DEFENDANTS LIABLE. OTHERWISE, RETURN TO THE COURTROOM WITH YOUR VERDICT. (YOU MAY ENTER DAMAGES ONLY AGAINST THOSE DEFENDANTS WHOM YOU HAVE FOUND LIABLE IN PARAGRAPH 1 OR PARAGRAPH 2).
 3. As to the claim(s) above for which we, the jury, have found in favor of the plaintiff, we hereby award:
 (a) compensatory damages:
 None_____.
 $900,000.
App. at 638a–39a.

When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

But Rule 49(b) specifically applies to a "General Verdict Accompanied by Answers to Interrogatories." Here, there was no general verdict. The "Verdict Form" submitted to the jury, *see supra* note 3, more properly is considered a verdict returned under Rule 49(a) "Special Verdicts," rather than under Rule 49(b) "General Verdict Accompanied by Answers to Interrogatories." Rule 49(a) contains no provision similar to that contained in Rule 49(b) stating that the "court shall return the jury for further consideration of its answers and verdict ...." Although it obviously would be preferable for counsel to cause an objection to be recorded on the basis of inconsistent answers in the Special Verdicts, no decision of this court has precluded appellate review of inconsistencies under a Rule 49(a) verdict in the absence of an objection before the jury was discharged. To the contrary, in *Halprin v. Mora*, 231 F.2d 197 (3d Cir.1956), this court considered the inconsistencies of answers to special verdicts even though the court noted that "nowhere in the record furnished us do we find evidence that the plaintiff considered the answers confusing, or inconsistent or irreconcilable." 231 F.2d at 201.

■ We conclude that the answers to Questions 1, 2(A), and 2(B) may be considered inconsistent and accordingly agree with the appellee-cross appellants. We will vacate the $900,000 verdict in the state law claims and order a new trial. Because this issue may recur, we will explain in some detail our perception of the inconsistencies and will offer suggestions how the problem may be avoided upon retrial.

### A.

We begin by examining the anatomy of the Pennsylvania civil conspiracy law.

Judge Sloviter has explained that the modern Pennsylvania tort of civil conspiracy is a fusion of two lines of cases. The tort may be made out upon proof of a "combination to do an unlawful act." This stems from an earlier conspiracy tort "in which the gist of the conspiracy was the tort itself." *Franklin Music Co. v. American Broadcasting Co.*, 616 F.2d 528, 549 (3d Cir.1979) (Sloviter, J., concurring in part). The tort may also be made out upon proof of a " 'combination to do a lawful act by unlawful means', [a concept that] stems from the cases holding that conspiring was itself an independent tort." *Id.* The gravamen of this second conspiracy formulation is the combination to do acts with intent to injure another. *Id.* at 551.

It was explained at oral argument that Question 2(A) was designed to cover the first formulation—a combination to do an illegal act.[4] Thus, the jury was asked if the defendants "conspired to tortiously interfere with [plaintiff's] contractual relationship with Crown Life." It was also explained that Question 2(B) was designed to cover the second formulation—a combination to do a lawful act by unlawful means.[5] Thus, the jury was asked if the defendants "conspired with the specific intent to inflict injury upon the plaintiff."

By its determination that defendants did not conspire "with the specific intent to inflict injury upon the plaintiff," it follows that the jury's conclusion that defendant conspired to tortiously interfere with plaintiff's contract with Crown Life must have been based on the first conspiracy formulation—an agreement to do an unlawful act. The jury, however, also determined, in its response to Question 1, that defendants had not "tortiously interfered with [plaintiff's] contractual relationship with Crown Life ...." Because there was proof of only one unlawful act, interference with a contractual relationship, *see* app. at 2428a, the jury's responses appear inconsistent. The answers may not be reconciled under

---

4. Oral argument transcript at 36.

5. *Id.*

an abandonment theory. There was no evidence adduced at trial that defendants either abandoned plans or accomplished a result different from that planned. Therefore, the jury's answers on the verdict form are inconsistent and irreconcilable. We turn to consider what may have caused the inconsistencies.

We believe it was Questions 2(A) and 2(B), relating to conspiracy, that led to jury confusion. Although the jury was given an instruction in the abstract explaining the difference under Pennsylvania law between the two types of conspiracies, there was no explanation of how these two esoteric concepts applied to the evidence that was presented. As appellate judges, we *now* know what was intended by Questions 2(A) and 2(B), but it required questioning at oral argument to clarify the matter. But unfortunately, at trial, the closing arguments of counsel did not even address the two different types of conspiracy and the jury instructions treated this very complex subject in legal terms somewhat lacking in perspicuity.[6]

We now know that counsel intended Question 2(B) to cover a theory that the termination of the Malley-Duff agency contract could have been a lawful act, but that the allegedly illegal combination to perform this act constituted the tort. This theory was expressed by asking the jury in 2(B) whether the "defendants conspired with the specific intent to inflict injury upon the plaintiff." But such a statement is woefully ambiguous. The jury could well have concluded that 2(B) was simply another way of expressing 2(A): that the defendants "conspired to tortiously interfere with [plaintiff's] contractual relationship with Crown Life." "Tortious interference" covers a multitude of sins, but at least it covers a situation where there is conduct "with the specific intent to inflict injury." We believe that it was not only possible, but also probable, that the jury did not understand the distinction between a conspiracy to tortiously interfere with plaintiff's contract and a conspiracy designed with a specific intent to inflict injury upon the plaintiff. Indeed, we are not confident that trained lawyers and judges who have studied the historical development of Pennsylvania civil conspiracy would have grasped the abstruse distinction without more explanation than was furnished the jury by counsel. The court charged that "[t]o prove a civil conspiracy under Pennsylvania law, the plaintiff must show ... that two or more persons ... combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." App. at 2537a. The court further charged:

> With respect to the plaintiff's claim that all of the defendants conspired to tortiously interfere with the plaintiff's contractual relationship with Crown, the plaintiff must prove, as to each defendant, that that defendant had the specific intent to interfere with plaintiff's contractual relationship.
>
> With respect to plaintiff's claim that all of the defendants conspired with the intent to injure it, the plaintiff must prove, as to each defendant, that that defendant had the specific intent to injure it.

*Id.* at 2541a. These instructions can be construed as applying the intent requirement to both conspiracy formulations. To the jury, the intent to do an unlawful act was, in all likelihood, synonymous with the intent to injure another. Devoid of a careful explanation, the two questions were too rich for the lay jury's blood. Based on

---

**6.** For example, the court instructed the jury:
The other type of conspiracy is one involving the use of unlawful means, which is found whenever there is a combination of persons or entities to do acts with the intent to injure another.
 Thus, a conspiracy which charges use of unlawful means does not require the use of illegal or tortious methods.

What it does require is that the participants act in concert with the intent to injure another.
 In this case, the plaintiff claims that all of the defendants conspired against it with the intent to injure plaintiff.
App. at 2537a–38a.

plaintiff's direct and circumstantial evidence, its tort theory seemed simple and straightforward: the defendants conspired to inflict injury upon Malley-Duff by tortiously interfering with its contract with Crown Life.

Requested special interrogatories and requested jury instructions should be simple and straightforward. If the case proceeds or is defended on alternative conspiracy theories, it will fall upon counsel to explain carefully in language capable of lay comprehension what is intended by the various conspiracy theories. Once this is accomplished, there will be more effective direction in fashioning both the special verdict form and jury instructions. And this should minimize the possibility of a jury again returning inconsistent answers.

### IV.

We now turn to other contentions presented by the appellant and appellee-cross appellants in their cross-appeals.

### A.

 First, appellee-cross appellants argue that the trial court erred by failing to instruct the jury on causation on the civil conspiracy issue. In reviewing jury instructions when error has been alleged, a new trial will be required only if the instructions, taken as a whole, give a misleading impression or inadequate understanding of the law and the issues to be resolved. *Bass v. International Brotherhood of Boilermakers,* 630 F.2d 1058, 1062 (5th Cir.1980). Here, the court gave a causation instruction when it charged the jury on the tortious interference claim, app. at 2536a, and again when it discussed the awarding of damages in general, app. at 2543a. We conclude, therefore, that because these causation instructions were properly given, the need for a causal connection was made sufficiently plain to the jury so as not to render the overall instructions misleading or inadequate.

7. Appellee-cross appellants also argue that Malley-Duff failed to establish the fact of damage.

 Next, we are satisfied with the court's exercise of discretion in refusing to admit evidence on how Herbert Sachs, now deceased, a former attorney of Craig, caused a bizarre investigation of the district judge originally assigned to this case. There is no question that Sachs's efforts were irresponsible, totally unjustified, and tantamount to sheer intimidation of a federal judge. Malley-Duff sought to introduce this evidence for punitive damages purposes and assigns the court's refusal to admit it as error. We find no abuse of discretion in refusing to admit this evidence on the ground that it would introduce a collateral matter that seems to implicate the attorney more than the litigant.

A related phase of this same problem involved evidence introduced that the Chicago office of Agency Holding purchased a paper shredder after the complaint was filed in this case. The trial judge instructed the jury that if it found that evidence had been intentionally destroyed, it could infer that the evidence would have been favorable to plaintiff. In explanation of the paper shredding, Craig unsuccessfully sought to introduce statements made by Sachs to Craig as to why he had embarked on his ill-fated mission and assigns as error the court's refusal to admit it. We hold that the court did not abuse its discretion in refusing to admit any evidence of the Sachs escapade. Had Craig been successful in having a partial account admitted, Malley-Duff would have been entitled to introduce the entire sordid tale of Sachs's machinations, a tale collateral to the main litigation.

### B.

All appellee-cross appellants argue that the evidence did not support the damages awarded to Malley-Duff. Specifically, the main thrust of their argument is that the method of valuation and evidence introduced by Malley-Duff was speculative and incapable of sustaining a damage award.[7] We disagree.

In view of our disposition of this case, we do not reach this issue. We note, however, that to

Generally, when the loss of business is alleged to be caused by the wrongful acts of another, damages are measured by one of two alternative methods: (1) the going concern value; or (2) lost future profits. *Arnott v. American Oil Co.*, 609 F.2d 873, 887 (8th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 663–64 (5th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). In the instant case, plaintiff opted to establish the going concern value. That value is the price a willing buyer would pay and a willing seller would accept in a free marketplace for the business in question. *Albrecht v. Herald Co.*, 452 F.2d 124, 131 (8th Cir.1971); Rulon, *Proof of Damages for Terminated or Precluded Plaintiffs*, 49 Antitrust L.J. 153, 154–55 (1980). Damages are measured as the difference between that price before and after the termination. *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 109 (3d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976).

To establish the going concern value, plaintiff applied a multiplier to the "Linton value" of the agency. The Linton value, an industry formula for determining the present value of a life insurance agency by reference to its vested renewal income, is capitalized through the use of the multiplier. The result of the formula is considered a reasonable approximation of what a willing buyer would pay and a willing seller would accept for the business.

Appellee-cross appellants challenge the use of the Linton value formula, and contend that Malley and Duff, partners in the Malley-Duff agency, were incompetent to present the data necessary to make the calculation. We find no error. "[W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment*

*Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Ashcraft v. C.G. Hussey & Co.*, 359 Pa. 129, 132–33, 58 A.2d 170, 172 (1948). Moreover, the proof may be indirect and may include estimates based upon assumptions. It is only necessary that the assumptions rest on adequate data. *Lehrman v. Gulf Oil Co.*, 500 F.2d 659, 668 (5th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); *see also William Goldman Theatres, Inc. v. Loew's, Inc.*, 69 F.Supp. 103 (E.D.Pa.1946), *aff'd per curiam*, 164 F.2d 1021 (3d Cir.), *cert. denied*, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948). The "law only requires that a reasonable quantity of information must be supplied by plaintiff so that the jury may fairly estimate the amount of damages from the evidence." *Ashcraft v. C.G. Hussey & Co.*, 359 Pa. 129, 132–33, 58 A.2d 170, 172 (1948); *see also Pugh v. Holmes*, 486 Pa. 272, 297, 405 A.2d 897, 909–10 (1979).

We are satisfied that such was the case here. Malley and Duff's estimates of the going concern value were based upon the agency's Linton value during the period in question, and the formula used as a multiplier was shown to be an accepted industry practice. *Cf. Standard Oil Co. of California v. Moore*, 251 F.2d 188, 221 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). Moreover, we have a neat sauce-for-the-goose scenario here. Notwithstanding appellees' objections to the use of the Linton value here, there was evidence that Craig and Lloyd used the same formula to establish price when they purchased other general agencies, such as Hartford (Linton × 2.5) and Newark (Linton × 3). App. at 1497a–99a, 1668–72a. Evidence was introduced that in the insurance industry, as in a number of industries, there are accepted formulas or rules of thumb that are employed as a means of valuing a business. Under such an accepted rule of thumb, a value is assigned by multiplying the annual earnings

---

the extent Malley-Duff shows, on remand, that loss of its business was caused by the unlawful

acts of defendants, the fact of damage is established.

or sales of the business unit by some factor to determine its going concern value. *See, e.g.*, Rulon, *Proof of Damages for Terminated or Precluded Plaintiffs*, 49 Antitrust L.J. 153, 155 n. 11 (1980). We conclude that the appellees were free to challenge the assumptions of the Linton value and multiplier and note that they did so for the jury. That they were unsuccessful as a matter of fact does not mean that the formula was incorrect as a matter of law.

## C.

 Finally, appellee-cross appellants complain that the court improperly excluded evidence to show that Malley-Duff's production was very low prior to its termination, and that subsequent to its termination the new general agent, EROC, achieved much higher production levels. The purpose of this evidence was to show that the termination of Malley-Duff was the result of Crown Life's independent action, rather than concerted action by the several defendants. We find no error in excluding this evidence. First, Crown Life did not know at the time it terminated Malley-Duff what its successor's performance would be. Accordingly, such evidence was irrelevant to the proposition that Crown's actions were non-conspiratorial. Moreover, this evidence could be considered misleading because EROC was the sole surviving Crown Life agency in Pittsburgh. The proffered EROC figures incorporated the combined business of the old Ehrman office, the old Malley-Duff office and the new firm. It was a case of comparing EROC apples, as the single surviving agency, with oranges, the production of one of two previous agencies. EROC's sales were therefore not necessarily comparable to Malley-Duff sales taken alone. Additionally, there was the distinct possibility that such evidence would have opened the door to many collateral issues, *inter alia*, the means by which EROC obtained its new business, and what portion of EROC's business lapsed from the books by its first anniversary and actually constituted a loss to Crown Life.

## V.

We have carefully considered all contentions presented by the appellant and cross-appellants. We will reverse the judgment of the district court and remand for a new trial consistent with the foregoing.