993 F.2d 882
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
FONTANA PIPE & FABRICATION, Plaintiff-Appellant,
v.
AMERON, INC., Defendant-Appellee.
 No. 91-35761.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 2, 1992.
Decided May 14, 1993.
 
 Before TANG, BRUNETTI and FERNANDEZ, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiff/appellant Fontana Pipe and Fabrication, Inc. ("Fontana") appeals the Magistrate's grant of defendant/appellee Ameron, Inc.'s ("Ameron") motion for a directed verdict and dismissal of Fontana's Sherman Act antitrust claims. We reverse and remand for a new trial.
 
 
 3
 * Fontana's parent company, Northwest Pipe & Casing Co. ("Northwest"), manufactures steel pipe, including large-diameter welded steel pipe used in water transmission projects. Northwest wanted to enter the southern California market, but high transportation costs made it impossible for its Portland, Oregon facility to compete there.
 
 
 4
 In early 1987, therefore, Northwest became interested in acquiring Kaiser Steel Corporation's ("Kaiser") steel pipe fabrication facility ("Kaiser plant") in Fontana, California. Buying the Kaiser plant would allow Northwest to enter the market immediately rather than waste time and money building a new facility and developing a reputation.
 
 
 5
 As part of its "due diligence" investigations into the southern California water transmission pipe market and the Kaiser plant's potential production and revenues, Northwest retained Peter Burke, a consultant (who became Northwest's Vice President of Planning and Finance in January 1988). Burke interviewed then-current and potential customers and then-current and former Kaiser plant marketing personnel. Based on the due diligence conducted by Burke and others, Northwest's officers decided to buy the Kaiser plant. They presented a "Kaiser Acquisition Proposal" to Northwest's board of directors in the fall of 1987. However, the board decided not to pursue the opportunity.
 
 
 6
 A group of investors and venture capitalists, who were represented on Northwest's board, decided to pursue the opportunity on their own. Toward this end, they formed Northwest Pipe (Fontana) ("NWPF") on October 8, 1987. Following negotiations between NWPF and Kaiser, the two parties executed a "Purchase and Sale Agreement" for the Kaiser plant, with an outside closing date of January 10, 1988, however, the deal never closed. On February 17, 1988, Kaiser and Ameron announced that they had executed an agreement under which Ameron would purchase the Kaiser plant, and that agreement closed on June 14, 1988.
 
 
 7
 In spite of this setback, NWPF decided to continue its efforts to enter the southern California market. In August 1988, it became a wholly-owned subsidiary of Northwest and was renamed Fontana Pipe and Fabrication. It bought a site in Victorville, California, and built a new facility from scratch.
 
 
 8
 On August 22, 1988, Fontana and Northwest also brought an action against Ameron, alleging generally that (i) Ameron tortiously interfered with the Kaiser plant purchase agreement between Fontana and Kaiser Steel and (ii) Ameron's acquisition of that plant substantially lessened competition, and tended to create a monopoly, in violation of the antitrust laws (§§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act). The matter went to trial and, at the conclusion of the plaintiff's evidence, the Magistrate granted Ameron's motion for a directed verdict on the ground that Fontana's proof of the extent of its damages was not sufficiently specific. Fontana appealed and we affirmed the Magistrate's decision on the state tort law claims, but reversed on the antitrust claims. Fontana Pipe and Fabrication, Inc. v. Ameron, Inc., No. 89-35864, 1990 WL 212661, 1990 U.S.App.LEXIS 22107 (9th Cir. Dec. 18, 1990). We found that the Magistrate might have applied an incorrect (and overly strict) standard to the plaintiff's presentation of evidence of antitrust damages, and remanded with instructions for the Magistrate to reconsider his decision granting a directed verdict in favor of Ameron in light of the proper standard. Id. at * 2, 1990 U.S.App.LEXIS at * 6.
 
 
 9
 On remand, the Magistrate again granted Ameron's motion for a directed verdict against Fontana's claims, and Fontana appeals from this judgment.
 
 II
 
 10
 A district court's grant of a directed verdict is reviewed de novo. See Erickson v. Pierce County, 960 F.2d 801, 804 (9th Cir.), cert. denied, 113 S.Ct. 815 (1992). A directed verdict is proper only if, without accounting for the credibility of the witnesses, the court finds that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the non-moving party, can support only one reasonable conclusion: that the moving party is entitled to the directed verdict. See Wilcox v. First Interstate Bank, 815 F.2d 522, 525 (9th Cir.1987).
 
 
 11
 As we noted in our prior disposition in this case, the Magistrate assumed Fontana had suffered an antitrust injury, and we have not been asked to disturb this finding. The Magistrate based his directed verdict on Fontana's supposed failure to specify its antitrust damages. Therefore, the only issue before us in this appeal is whether Fontana presented at trial sufficient evidence of these damages to overcome a directed verdict.
 
 
 12
 To recover damages, an antitrust plaintiff must provide "sufficient evidence to permit a just and reasonable estimate of the damages." William Inglis & Sons v. Continental Baking, 942 F.2d 1332, 1340 (9th Cir.1991) (internal quotation omitted), amended, in part, on reh'g, 981 F.2d 1023 (9th Cir.1992). This evidence must provide the jury "with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 836 (9th Cir.1982) (citing Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946)). This standard "is designed to ensure a quantification of injury that is 'approximate' rather than highly precise and certain." Inglis, 942 F.2d at 1340 (citing Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1511 (9th Cir.1985)). The proof may be indirect and may include estimates based upon assumptions; it is only necessary that the assumptions rest on adequate data. Malley-Duff & Associates v. Crown Life Ins. Co., 734 F.2d 133, 148 (3d Cir.), cert. denied, 469 U.S. 1072 (1984).
 
 
 13
 Fontana sought to prove that its damages should be its "lost profits": the profits it would have realized had it acquired the Kaiser plant, offset by the profits made by the Victorville facility. Lost profits are a viable and valid measure of antitrust damages. Lehrman v. Gulf Oil Corporation, 500 F.2d 659, 663-664 (5th Cir.1974), cert. denied, 420 U.S. 929 (1975); see also Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1297 (9th Cir.1984), cert. denied, 469 U.S. 1190 (1985).
 
 
 14
 Fontana's lost profits were calculated by Roy Weinstein, an economist and antitrust expert with extensive experience analyzing the anticompetitive effects of certain conduct and the damages resulting from that conduct. Weinstein developed four estimates of lost profits: the first two were based on data contained in the Kaiser Acquisition Plan prepared by Burke, and the other two were based on data contained in an Ameron business plan. Weinstein first estimated the future revenues and costs of the Kaiser plant, and then subtracted costs from revenues to obtain an estimate of future profits. He then discounted the future profits back to their present value using a discount rate. He performed the same steps for the Victorville facility and then subtracted the Victorville projected profits from the Kaiser plant projected profits to obtain the lost profits.
 
 
 15
 These calculations yielded four damages estimates, ranging from $15.5 million (the "conservative" estimate based on the Ameron business plan) to $41.1 million (the "most likely" estimate based on the Kaiser Acquisition Plan). The provision of a range of estimates does not in itself prove that the figures are overly speculative. See, e.g., Inglis, 942 F.2d at 1341 (plaintiff offered as alternative damages figures two estimates of going concern value; there was sufficient evidentiary basis for the lower one).
 
 
 16
 Because Weinstein stated that he believed the $41 million estimate of damages to be the most likely, most of Ameron's efforts at trial and on appeal were devoted to attacking the data and assumptions underlying this estimate, which, as stated above, was based on information provided by Burke. Most of the challenges were directed at Burke's estimates of future revenues and costs (and therefore future profits).
 
 
 17
 However, these challenges do not apply to the profit estimates contained in the Ameron business plan that Weinstein used to calculate the lower two of his four damages estimates. Ameron's own estimates would have provided the jury with sufficient evidence to form a "just and reasonable" estimate of future Kaiser plant profits. See, e.g., Lehrman, 500 F.2d at 668 (plaintiff's expert's projections of future gas station sales not overly speculative because, inter alia, confirmed by competitor of plaintiff); Pierce v. Ramsey Winch Co., 753 F.2d 416, 441 (5th Cir.1985) (plaintiff's expert's projections of future winch sales not overly speculative because, inter alia, confirmed by another winch distributor). The validity of Weinstein's calculations is further supported by the fact that he is an economist and a recognized expert in the field of estimating antitrust damages.
 
 
 18
 The Magistrate rejected several of the other bases for the damages estimates based on Ameron's business plan. First, he criticized Weinstein's projection of profits to infinity, when in fact the steel pipe market ran in twenty-year cycles, with a ten-year "active" period followed by a ten-year "dormant" period. However, Weinstein's study clearly separated profits lost during the 1989-98 decade from profits lost thereafter; if the jury believed that Fontana should have been awarded damages only for the first decade, they could have easily selected the appropriate figure.
 
 
 19
 The Magistrate also criticized Weinstein's calculation of future profits for the Victorville facility, because Weinstein estimated that the Victorville facility would sell three times as much during the dormant part of the cycle as Ameron did during the prior dormant stage. This criticism implies that Weinstein projected unrealistically high future sales for Victorville; but if this were true, Weinstein was only hurting Fontana's cause, because higher future Victorville sales would have translated into higher future Victorville profits, a larger offset against estimated future Kaiser plant profits, and therefore lower damages. If anything, therefore, Weinstein was being excessively cautious about the magnitude of the damages.
 
 
 20
 Overall, because the lower two of Weinstein's estimates were based largely on projections made by Ameron itself, we find that they would have provided the jury with sufficient evidence to form a "just and reasonable" estimate of Fontana's damages. This finding alone requires us to reverse the Magistrate's grant of Ameron's motion for a directed verdict and remand for a new trial.
 
 III
 
 21
 Fontana also claims that the record includes "undisputed" evidence of its damages, in addition to the Weinstein estimates. The first example is the $5.9 million in profits allegedly realized by Ameron on orders received by the Kaiser plant after it was acquired by Ameron but before the Victorville facility became operational. However, this figure, set out in Exhibit 280, does not represent net profit on these orders; according to Weinstein's testimony at trial, it represents "contribution," or the difference between the revenues from such orders and their direct (variable) costs. It did not include an additional offset for fixed and other costs and was thus not a "bottom-line" profit measure. Thus, it could not have provided the jury with a basis for a just and reasonable estimate of such profits.
 
 
 22
 Finally, Fontana contends that the record includes evidence that Fontana incurred $318,549 in out-of-pocket expenses while trying to acquire the Kaiser plant. This amount is broken down into individual expenses in Exhibit 146. There are two problems with this figure. First, it is unclear whether Fontana did in fact incur the expenses; Exhibit 146 is entitled "NORTHWEST PIPE AND CASING COMPANY--Kaiser Acquisition Costs," which implies that Northwest and not Fontana incurred the expenses. Second, even if Fontana did in fact incur these expenses, it has not presented a legal theory that would permit recovery of them.
 
 IV
 
 23
 Estimating lost profits requires making assumptions about the future, which by its very nature is an uncertain enterprise that involves a certain amount of "speculation." However, as long as those assumptions are reasonable and supported by adequate data, an antitrust plaintiff should be permitted to present its estimates to the jury. As the Supreme Court noted in Story Parchment Co. v. Paterson Co., 282 U.S. 555 (1931):
 
 
 24
 Whatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced.
 
 
 25
 Id. at 565 (quoting Gilbert v. Kennedy, 22 Mich. 117, 131 (1871)). In this case, Weinstein presented two damages estimates that were backed by reasonable assumptions and adequate data. Because these would have provided the jury with sufficient evidence from which to derive a just and reasonable estimate of Fontana's damages, we reverse the Magistrate's grant of Ameron's motion for a directed verdict and remand for a new trial.
 
 
 26
 REVERSED and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Circuit Rule 36-3