**PHILADELPHIA FAST FOODS, INC., et al.**

v.

**POPEYES FAMOUS FRIED CHICKEN, INC., et al.**

**Civ. A. No. 84–825.**

United States District Court, E.D. Pennsylvania.

March 13, 1986.

David L. Pennington, Roger B. Wood, Philadelphia, Pa., for plaintiffs.

David J. Butler, Peter J. Klarfeld, Gary C. Tepper, Washington, D.C., for Popeyes Famous Fried Chicken, Inc.

Joseph M. Gindhart, Philadelphia, Pa., for Marriott Corp.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Plaintiffs Philadelphia Fast Foods, Inc., and Philadelphia Fast Foods Partnership, collectively known as "PFF", brought this action against defendants Popeyes, Inc. ("Popeyes") and the Marriott Corporation ("Marriott") alleging that Popeyes and Marriott violated the antitrust laws, that Popeyes breached a contract with PFF, and that Marriott tortiously interfered with PFF's actual and prospective contractual relations with Popeyes. Specifically, PFF claims that Popeyes and Marriott conspired to restrain trade and monopolize the market in "spicy fast food chicken" and that PFF had entered an agreement with Popeyes that gave PFF the right to open five additional franchises in the Philadelphia area, which Popeyes breached by granting Marriott the exclusive right to develop Popeyes' franchises in the Philadelphia area.

At the close of a jury trial lasting three weeks, I directed a verdict for the defendants on PFF's per se claim under Section 1 of the Sherman Act (the "Act"). The jury found for the defendants on all of the remaining claims. In answer to special interrogatories, the jury found that Popeyes and Marriott did not conspire to restrain trade and that PFF had failed to prove the existence of the alleged product market in "spicy fast food chicken." The jury further found that Popeyes and PFF had not entered into an agreement extending PFF additional franchise rights because they did not intend to be bound contractually until they entered into a formal Popeyes' Option Agreement, and that Marriott did

not tortiously interfere with any of PFF's actual or prospective contractual rights.

PFF has now moved for a judgment notwithstanding the verdict or for a new trial contending that this court made numerous errors, 132 to be exact. As the discussion below will reveal, this catalog of errors is characterized by misstatements of the governing principles, objections not raised at trial, facts not supported by the record, and irrelevant issues which the jury was never required to reach. Accordingly, for the reasons that follow, PFF's motion for a judgment notwithstanding the verdict or for a new trial will be denied.[1]

## THE FACTS

Popeyes is a Louisiana corporation which has franchised fast food restaurants specializing in the sale of fried chicken since 1976. At the time of trial, there were eleven Popeyes' franchised restaurants in Philadelphia, ten of which are operated by Marriott and one by Charles Maxwell, Arlie Maxwell, Robert Carrick and Glenna Malcolm, who together formed the Philadelphia Fast Food Partnership.

According to the evidence adduced at trial, there is a four step procedure for obtaining a Popeyes' franchise. First, when an interested applicant contacts Popeyes, Popeyes sends the applicant information and a financial information request form. Second, if the applicant complies and returns the form, the applicant will be asked to forward a refundable $5000.00 good faith deposit and come in for an interview. Both Terrel Rhoton and William A. Copeland, III of Popeyes testified that the purpose of the deposit is to demonstrate that the applicant is seriously interested in acquiring franchise rights.[2]

If Popeyes finds the applicant to be an acceptable operator and financially sound, Popeyes and the applicant may enter into an Option Agreement. The Option Agreement is a standard Popeyes' form agreement which grants the applicant an option to develop (1) an agreed upon number of Popeyes' stores (2) in a defined area (3) to be opened within a specific time period. The option agreements do not specify individual locations for each store, but rather set out geographic boundaries in terms of city blocks within which all agreed upon stores must be located. If after receipt of the $5000.00 deposit, Popeyes and the applicant cannot, for any reason whatsoever, agree upon these three terms, or any other terms, Popeyes refunds the $5000.00 in full.[3] Copeland testified that Popeyes has never granted franchise rights without first executing a Popeyes Option Agreement.

Finally, the applicant exercises each option by entering into an individual Franchise Agreement for each store to be opened under the Option Agreement. Before a store can be opened, the applicant must also obtain Popeyes' approval for a particular site within the territory granted. In defining territories and approving individual locations for a prospective franchisee, Popeyes introduced evidence that it will not permit a franchisee to open a Popeyes store that would compete with another unit in the Popeyes' system, so as to maximize Popeyes' competition with other vendors.[4] The Option Agreement further

---

1. PFF's request for a judgment notwithstanding the verdict is particularly inappropriate. Under Rule 50 of the Federal Rules of Civil Procedure, a judgment notwithstanding the verdict ("JNOV") may be granted only where, viewing the evidence in the light most favorable to the non-moving party, there was *no* evidence presented at trial upon which the jury could properly find a verdict for those parties. *See, Galloway v. United States,* 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); *Denneny v. Siegel,* 407 F.2d 433 (3d Cir.1969). As there is ample evidence in the record that supports the jury's findings in response to the special interrogatories, the motion for a JNOV must be rejected.

2. William A. Copeland, III is the executive vice-president of the franchise sales department. Terrel Rhoton is his assistant. *See,* Testimony of Williams A. Copeland, III, May 7 Tr. at 7–10.

3. Testimony of Terrel Rhoton, May 6 Tr. at 7–10.

4. Popeyes is permitted to alter the terms of the Franchise Agreement between the time the Option Agreement is signed and the individual franchise agreement is executed, except with respect to royalties and the term of the franchise. See, Popeyes Option Agreement with

specifies that "time is of the essence." Thus, if an applicant fails to open stores in accordance with the schedule set forth in the Option Agreement, he forfeits all rights to his territory, but may continue to operate any Popeyes stores already opened.

In October of 1982, Charles Maxwell and his partners entered into a standard Popeyes Option Agreement for one store. This Option Agreement provided that Maxwell and his three partners would be given until April 8, 1983, to open one Popeyes franchise. Maxwell exercised this option and entered into a Franchise Agreement on December 16, 1982, for a store at 139–143 West Chelten Avenue in Philadelphia.

On March 24, 1983, Maxwell wrote to Popeyes enclosing an unsolicited $5000.00 check and stating *inter alia:*

> This $5000.00 will be used to secure territorial franchise rights to the following area of Philadelphia pending a formal contract:
>
> The eastern portion of territory formally (sic) held by Mr. Kenneth Wall PLUS an extension of the southern boundary of that territory to Chestnut Street.
>
> The formal definition of the territory will be made after the franchise conference with all territorial rights transferred by April 30th.
>
> .    .    .    .    .
>
> Philadelphia Fast Food Partnership maintains its right to withdraw the $5000.00 (minus expenses) if a mutually agreeable number of options for this area cannot be determined.
>
> .    .    .    .    .
>
> We have substantial financial commitment. Our sources of capital should be stronger than any franchisee in the franchise community.

Popeyes responded by letter dated April 1, 1983, as follows:

> This letter acknowledges receipt of your check # 1161 in the amount of $5000.00 payable to Popeyes Famous Fried Chicken. This sum represents a good faith deposit and will secure a yet to be determined five (5) store area in Philadelphia, Pennsylvania.
>
> In your letter to us dated March 24, 1983 you made reference that you have secured a strong financial commitment. Please forward to us a copy of this financial commitment. If it is strong enough we would be more than happy to let you acquire additional territory.

PFF contends that these letters created a binding agreement between itself and Popeyes to enter into an option agreement for five additional stores in the Philadelphia area. PFF concedes that it never entered into a standard Option Agreement, nor did it send any financial information.[5]

On July 12, 1983, Popeyes sent Maxwell the following letter:

> It has been three months since accepting your $5000.00 deposit on Philadelphia and nothing has transpired since that time. You have failed to live up to running your store in an organized manner and therefore I have no other alternative but to return your $5000.00 therefore giving you no further rights to any other portion of the City of Philadelphia.

PFF contends that this constituted a breach of the agreement created by the two letters. Although Charles Maxwell protested to Popeyes both orally and in writing concerning Popeyes' withdrawal from negotiations over additional stores, Maxwell subsequently cashed the refund check.

Thereafter, Maxwell and his partners entered into an agreement purporting to transfer their rights under the Option Agreement of October 7, 1982 to Philadelphia Fast Foods, Inc.[6] Maxwell sought

Maxwell dated October 7, 1982, Plaintiff's Exhibit 3.

**5.** Testimony of Charles Maxwell, April 24 Tr. at 89–90.

**6.** PFF Inc. was created by Maxwell and his partners, and together they own 100% of the stock in the corporation. Charles Maxwell is the president and Arlie Maxwell is the vice-president.

Popeyes' permission to do so as required by the Option Agreement, but there is no evidence that Maxwell sought or obtained permission to transfer rights to the alleged additional territory.

The evidence introduced at trial also reveals that Popeyes first discussed the possibility of selling franchise rights to Marriott in mid to late April of 1983, but that no agreement was reached with Marriott until December 8, 1983, when a formal Option Agreement was executed. PFF's contention that William Copeland of Popeyes informed Marriott that PFF had existing rights to obtain additional franchises prior to the return of the deposit on July 12, 1983, is not supported by any citation to the record, and indeed, Copeland expressly denied this in his testimony. May 7 Tr. at 27 and 30. In addition, Copeland testified that the use of an exclusive development agreement was a desirable marketing strategy, and Popeyes has regularly used such agreements in other parts of the country.

THE PER SE CLAIM UNDER § 1 OF THE SHERMAN ACT

PFF's initial contention is that the grant of exclusive territorial rights by Popeyes to Marriott constitutes a per se violation of § 1 of the Sherman Act, which it variously describes as a "horizontal market allocation", a "group boycott" and a "concerted refusal to deal." Specifically, PFF contends that Marriott demanded exclusivity although it knew of PFF's existing rights in Popeyes' franchises, and by acceding to this request, Popeyes entered into a conspiracy with Marriott to exclude PFF from the market. PFF asserts that the court erred in directing a verdict for the defendant with respect to the plaintiff's per se claim under § 1 of the Act, and in refusing to charge the jury or submit special interrogatories to them on this issue.

■ PFF's contention is flawed in several respects. First the jury found that there was no conspiracy to restrain trade, thus precluding the existence of any claim under Section 1 of the Act. Secondly, the relationship between Popeyes and Marriott is a vertical one, and the conduct complained of

involves the grant of exclusive territorial rights by a franchisor to a franchisee. Application of the per se rule in this context has been expressly rejected by the Supreme Court. *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Finally, PFF has failed to identify any facts that establish the concerted action necessary to support a claim of group boycott. Accordingly, PFF's claim that this court erred in directing a verdict on the per se claim is without merit.

Section 1 of the Sherman Act provides: [e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal. 15 U.S.C. § 1 (1982).

Because almost all business agreements may be interpreted as restraining trade to some degree, § 1 has been construed to preclude only those contracts or combinations that "unreasonably" restrain competition. *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In determining whether conduct unreasonably restricts competition, the courts employ two rules—the per se rule and the rule of reason. Generally, a "rule of reason" analysis is employed to determine whether § 1 has been violated. *Malley-Duff & Assoc. v. Crown Life Ins. Co.,* 734 F.2d 133 (3d Cir.1984). Under this analysis, agreements are evaluated by examining their effects upon competition within relevant geographic and product markets.

An exception to the rule of reason approach has been carved out for those agreements which have a "pernicious effect" on competition and "lack any redeeming virtue" so that they may be presumed unreasonable "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518 (1958); *Malley Duff & Assoc. v. Crown Life Ins. Co., supra,* 734 F.2d at 139. Activities that

have been identified as per se violations include price fixing, retail price maintenance, group boycotts, tying arrangements, and certain types of reciprocal dealing. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir.1979).

Whether a claim is governed by the per se rule or the rule of reason under § 1, the Act requires proof of a "contract, combination or conspiracy" in restraint of trade. It is beyond peradventure that the Act does not reach unilateral conduct, and a manufacturer may sell its products to whomever it wishes. *United States v. Colgate & Co.*, 250 U.S. 300, 29 S.Ct. 465, 63 L.Ed. 992 (1919); *Cernuto, Inc. v. United Cabinet Corp., supra*, 595 F.2d at 167. The Third Circuit has noted that the statutory language presents a "single concept about common action", and thus simply requires proof of "concerted action". *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

▪ Although I directed a verdict for the defendants with respect to the per se claim, the jury was nevertheless asked to consider whether there was a contract, conspiracy to restrain trade, a prerequisite to any claim under § 1 of the Act. May 9 Tr. at 122–123. It is only after the finder of fact has made this initial determination that the per se or rule of reason distinction becomes significant. The first special interrogatory submitted to the jury asked:

> Do you find, by a preponderance of the evidence, that a conspiracy or agreement existed between Popeyes and Marriott to restrict competition?

The jury answered "No". Thus, the jury found that Popeyes' grant of exclusive territorial rights to Marriott was an independent business decision by Popeyes to adopt a desirable marketing strategy rather than the result of any pressure from Marriott to exclude competition. PFF's assignment of error as to the direction of the verdict on

the per se claim may be rejected on this basis alone. Nonetheless, PFF's contention must be rejected for the additional reason that the arrangement and conduct that PFF challenges has been held to be inappropriate for per se scrutiny by the Supreme Court.

In *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Supreme Court was confronted by a claim that Sylvania had violated § 1 of the Sherman Act by entering into and enforcing franchise agreements that prohibited the sale of Sylvania products other than from specified locations. The Court upheld the right of Sylvania to terminate a distributor when that distributor began to sell outside of its allotted territory. In analyzing the effect of the location clause, the Court emphasized that although vertical restrictions of this nature tend to reduce intraband competition, they have the redeeming virtue of promoting interbrand competition. *Id.* at 54–55, 97 S.Ct. at 2559–60. The court reasoned that such restrictions are in fact beneficial to competition because they enable manufacturers to compete more effectively against other manufacturers. For example, such restrictions could be used to induce competent and aggressive retailing without fear of free riders, or better enable a manufacturer to enter the market as a new competitor. *Id.* at 55, 97 S.Ct. at 2560.

Thus, the Court concluded that, on balance, non-price restrictions in vertical distribution arrangements possess sufficient economic benefits to warrant their testing under a rule of reason standard. Finally, although the Court did not foreclose the possibility that certain types of vertical restrictions might warrant application of the per se rule, it noted that departure from the rule of reason standard must be based upon "demonstrable economic effect rather than—as in *Schwinn* [388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)]—upon formalistic line drawing". *Id.* at 59, 97 S.Ct. at 2562.[7]

---

7. The Supreme Court thus overruled its earlier decision in *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), which applied a partial per se test to vertical territorial restrictions.

The conduct PFF challenges under § 1 of the Sherman Act was Popeyes' grant of exclusive territorial rights to Marriott. The grant of exclusive territorial rights by a franchisor to a franchisee is a classic vertical arrangement that tends to promote interbrand competition by encouraging greater capital investment and advertising by the franchisee. Indeed, the majority of courts that have considered the issue have applied a rule of reason analysis to the grant of exclusive franchises. *See, e.g., JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc,* 698 F.2d 1011, 1018 (9th Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983); *GTE Sylvania, Inc. v. Continental T.V., Inc.,* 537 F.2d 980, 997 (9th Cir.1976) *(en banc), aff'd,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 176 (1977); *Packard Motor Car Co. v. Webster Motor Co.,* 243 F.2d 418, 420 (D.C.Cir.), *cert. denied,* 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 900 (1957). As such, the conduct challenged here is clearly within the ambit of *Sylvania.*

■ PFF attempts to circumvent this persuasive line of cases by characterizing the arrangement as a "horizontal market allocation" that is subject to the per se rule. PFF misperceives the nature of horizontal and vertical relationships. Whether a market allocation is horizontal or vertical is determined by the relationship between the alleged conspirators, not by the relationship between the alleged conspirator and the plaintiff as PFF suggests. As defined by the Supreme Court, a horizontal market allocation is an "agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 601, 92 S.Ct. 1126, 1130, 31 L.Ed.2d 515 (1972). As PFF and Popeyes are clearly not competitors at the same level of the market structure, there is no horizontal market allocation at issue.

PFF's rambling and, at times, confusing effort to recast what is a simple vertical arrangement of the type contemplated by *Sylvania* into a group boycott or concerted refusal to deal that is subject to per se treatment under the Act must also be rejected. A group boycott, and thus a per se violation, is made out where there is concerted action "with a purpose either to exclude a person or group from the market, or to accomplish some other anticompetitive objective, or both." *Malley-Duff & Assoc. v. Crown Life Insurance Co.,* 734 F.2d 133, 140 (3d Cir.1984); *citing, DeFilipo v. Ford Motor Co.,* 516 F.2d 1313 (3d Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975). Thus, a plaintiff must prove, either by direct or circumstantial evidence, that the manufacturer or franchisor and other parties had a "conscious commitment to a common scheme designed to achieve an unlawful objective". *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Independent action is not proscribed. *Id.* Moreover, the Third Circuit has emphasized that the application of the per se rule in this context should be limited to those situations constituting "classic" group boycotts. *Malley-Duff & Assoc. v. Crown Life Insurance Co., supra,* 734 F.2d at 142.

PFF asserts that Marriott and Popeyes entered into a conspiracy which had as its purpose the exclusion of other franchisees, including PFF, from the Philadelphia market in Popeyes franchises. PFF further contends that Marriott instigated this scheme by demanding exclusivity in the Philadelphia area, and PFF was ultimately excluded from all but one location when Popeyes acceded to this demand and terminated its right to open five additional franchises in the area. PFF argues that this conduct constitutes a group boycott. Not only has PFF failed to establish the "concerted action" necessary to sustain a group boycott claim, but its arguments in support of its position reveal a basic misunderstanding of the nature of the group boycott theory.

■ Initially, the jury's finding that there was no contract or conspiracy between Marriott and Popeyes to restrain

trade precludes a finding of concerted action in the group boycott context as well.

Nevertheless, PFF makes several rather convoluted arguments in support of its position that there was enough evidence to send the per se group boycott claim to the jury. Apparently in an attempt to distinguish *Sylvania*, PFF first argues that a conspiracy to exclude a competitor need only be "partly horizontal and partly vertical", in that it is sufficient if the injured party has a horizontal relationship with just one of the conspirators to make out a per se violation of the Act under the group boycott theory. PFF relies on *Klor's, Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1957) and *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) to support its position. PFF misconstrues the rule of these cases.

In *Klor's*, a retail appliance dealer charged that manufacturers and distributors of well known brands of appliances had conspired among themselves and with Broadway Hale, another retailer, not to sell appliances to the plaintiff or to sell them to the plaintiff only at discriminatory prices and on highly unfavorable terms. In holding that the conduct of the defendants constituted a group boycott and was unreasonable per se, the Court noted that there was a "wide combination consisting of manufacturers, distributors and a retailer." 359 U.S. at 212–13, 79 S.Ct. at 710. The Court expressly distinguished this situation from that of a manufacturer and dealer agreeing to an exclusive distributorship. *Id.*

PFF simplistically concludes that because the conspiracy included manufacturers, distributors and a retailer, *Klor's* stands for the proposition that a group boycott may exist if a conspiracy is "partly horizontal and partly vertical". PFF ignores the decisive factors on which the Court relied and its pronouncement distinguishing an exclusive dealership from that of a group boycott. It is difficult to comprehend how PFF can argue that *Klor's* actually supports its position given the dissimilarities in the factual situations.

PFF's reliance on *General Motors* is similarly misplaced. In *General Motors*, the Supreme Court held that joint collaborative action by an association of dealers and G.M. to terminate dealings with other distributors who sold to discounters was a classic conspiracy and was unlawful per se. 384 U.S. at 143–44, 86 S.Ct. at 1329–30. Although G.M. seemingly imposed vertical restraints when it pressured dealers not to deal with discounters, the Court emphasized the horizontal nature of the arrangements, noting that the restraints were in fact induced by dealers seeking to choke off aggressive competition at their level. *Id.* Furthermore, the court emphasized that the agreement acted as a substantial restraint upon price competition, which also warrants application of the per se rule.

PFF argues that *General Motors* establishes that a per se violation may be made out in cases involving vertical restraints. Once again, PFF disregards the reasoning underlying the Supreme Court's decision and concentrates on the "formalistic line drawing" cautioned against in *Sylvania*. Indeed, the Court in *General Motors* emphasized the horizontal nature of the conspiracy and the substantial restraint it had upon prices as the key factors in its analysis. These factors are clearly not present in the instant case which involves a simple vertical territorial restriction.

Recognizing that *Klor's* and *General Motors* involve multiple conspirators and thus are distinguishable, PFF next argues that a group boycott may be found where a single manufacturer or franchisor conspires with a single dealer or franchisee to effect an unlawful purpose. PFF cites *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979) and *Malley-Duff & Assoc. v. Crown Life Insurance Co.*, 734 F.2d 133 (3d Cir.1984) in support of this theory. PFF once again misconstrues these cases. It is true that the Third Circuit has declined to read *Sylvania* as undermining all per se rules applied to primarily vertical restraint. *Cernuto*, 595 F.2d at 167, n. 15. Rather, the Court in *Cernuto* determined that per se condemna-

tion of apparently vertical restraints may be appropriate where the purpose and effect of those restraints is to limit horizontal competition.

In *Cernuto,* the plaintiff claimed that it had been terminated as a dealer in United's line of kitchen cabinets because a competing dealer complained to the manufacturer that the plaintiff was discounting the cabinets. The court noted that manufacturers are generally free to impose vertical territorial restrictions, but the presence of two factors raised the possibility of a per se violation. First, the action of United was not unilateral but was taken at "the direction of one of his customers seeking to suppress its competition by utilizing the power of a common supplier." *Id.* at 168. Thus, the impact of the restraint was primarily horizontal, as the purpose and effect of the termination was to eliminate competition at the retail level and not, as in *Sylvania,* to promote competition at the manufacturer level.

More importantly, the complaining dealer allegedly was seeking to eliminate price competition. *Id.* The court emphasized that if the purpose and effect of challenged conduct is to restrain price movement, it is illegal per se. *Id.* at 169. Accordingly, the Court overturned a summary judgment for the defendants and remanded for trial on grounds that the evidence might make out a per se violation on the theory that there was a conspiracy to fix prices by eliminating price competition from the market.

█ The situation at hand is readily distinguishable from that at issue in *Cernuto.* The record is simply devoid of any evidence whatsoever that the purpose and effect of the vertical restriction was to limit horizontal competition. The jury decided that there was no contract or conspiracy between Marriott and Popeyes to restrain trade, evidently because they found that the grant of exclusive territorial rights to Marriott was an independent business decision by Popeyes rather than the result of pressure by Marriott to exclude all other competitors from the Philadelphia market in Popeyes franchises.

Moreover, there is no allegation in PFF's complaint, and there was no proof at trial, that there was any price motivation underlying Popeyes refusal to grant PFF additional franchises. Indeed, pursuant to Popeyes long established policy for the spacing of its franchise units, Popeyes' restaurants do not compete with one another in price or in any other manner. *See, Testimony of Copeland,* May 7, Tr. at 22. Rather, Popeyes' decision, as demonstrated at trial, was grounded on its desire to obtain a successful company with a proven track record as a franchisor rather than a small marginal company with minimal experience. Thus, the purpose and effect of the termination was not to eliminate competition at the retail level, but to promote competition at the manufacturer/franchisor level. The *Cernuto* exception to the rule of reason approach does not apply in this situation.

PFF's reliance on *Malley-Duff & Assoc. v. Crown Life Insurance Co.,* 734 F.2d 133 (3d Cir.1984) is similarly misplaced. In *Malley-Duff,* the Third Circuit determined that an agreement between insurance sellers, all of whom were competitors of Malley-Duff in the insurance sales business, had conspired among themselves and with Crown Life to freeze Malley-Duff out of the Crown Life Insurance market. 734 F.2d at 141. Relying on the language in *Cernuto* that a vertical restraint might constitute a per se violation if its purpose and effect is to limit horizontal competition, the court concluded that the vertical nature of the restraint did not defeat Malley-Duff's right to go to the jury on the theory of a per se group boycott because its impact was primarily horizontal in nature. In addition, the court concluded that the evidence revealed a "classic group boycott: concerted action by competitors to excluded Malley-Duff from the market. *Id.* at 142. The fact that the life insurance company was involved in the conspiracy was not a decisive factor.

In sum, PFF has not demonstrated that this court erred in directing a verdict for the defendants on the per se claim for a

number of reasons. As the discussion above reveals, there simply was no evidence to allow the claim to go to the jury. The record is "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *citing, Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969). Accordingly, PFF's motion for a judgment notwithstanding the verdict or for a new trial on this ground is denied.

## THE CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

■ PFF's principal contention with regard to its claim under § 2 of the Sherman Act is that the court failed to properly instruct the jury on the relevant product market. Specifically, PFF contends that the jury should have been instructed that there were relevant product markets in "Popeyes' franchises" and in "Popeyes' spicy fast food chicken" in addition to the instruction given on the market in "spicy fast food chicken." There was no error in failing to instruct the jury on these purported markets because PFF introduced no evidence upon which a jury could have found relevant product markets in these commodities. Moreover, since PFF failed to properly object at trial to this aspect of the instructions on the relevant product market, PFF has not properly preserved its right to challenge this issue on a post-trial motion.

Section 2 of the Sherman Act prohibits all monopolies and every attempt or conspiracy to monopolize commerce. An essential prerequisite to a claim of monopoly under § 2 is "the possession of monopoly power in the relevant market". *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966). This typically involves a delineation of the product and geographic lines within which the specific commodity is sold.

Definition of the relevant product market involves identification of all the substitutes available to buyers of the seller's product.

In identifying these products, the Supreme Court has emphasized that courts must determine what products have "reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). Thus, factors such an "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" should be considered in determining interchangeability. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

As an initial matter, PFF's failure to object at trial to the absence of an instruction on "Popeyes franchises" precludes PFF from raising such an objection at this time. Rule 51 of the Federal Rules of Civil Procedure requires a party objecting to an instruction or the failure to give an instruction to do so at trial and to state the specific grounds for the objection.

At the charging conference, PFF objected to the use of the word "interchangeable" in the defendants' proposed jury instructions, but did not object on the basis that it omitted an alternative theory of a market in "Popeyes franchises". Tr. May 8 at 86–87. At trial, I instructed the jury as follows:

> Philadelphia Fast Foods has taken the position that a fast food spicy chicken served with other spicy dishes alone represents the relevant product market market. Popeyes and Marriott have argued that the relevant market is larger than fast food spicy chicken, it includes all fast food chicken and all types of other fast foods, including hamburgers and pizza.
>
> If and only if you find by a preponderance of the evidence that fast food spicy chicken as described is not considered reasonably interchangeable with other fast food products, you may find that

fast food spicy chicken constitutes a separate product market. May 9 Tr. at 130. Following the charge, PFF objected to the instruction because it was "in the nature of an improper binding instruction." May 9 Tr. at 171. Thus, PFF did not in any manner inform the court that its objection was based on the omission of a product market in "Popeyes' franchises".

PFF's objection to special interrogatories 2 and 8 is similarly flawed.[8] PFF only registered a general objection disputing inclusion of the word "only" in the interrogatories and did not make any reference to a market in Popeyes franchises. As such, PFF should not be heard to complain about the absence of such an instruction at this point in the proceedings.

■ Nevertheless, even though PFF did not properly preserve its right to raise the issue in its post trial motion, I find it unnecessary to rest my decision on this ground, as the record is devoid of any factual support for PFF's contention that the jury should have been instructed on a market in Popeyes' franchises.

PFF relies solely on the testimony of Dr. Shepherd, its expert witness, as evidence that there is a relevant product market in Popeyes' franchises. Dr. Shepherd's testimony on this aspect of the case reads as follows:

Q. Did you identify any other relevant market to the issues in this case, related or unrelated to spicey [sic] fast food chicken?

A. Yes. I think it helps to picture also competition for the franchises issued by Popeyes in the Philadelphia area.

This was in this case the competition between Marriott and the plaintiff, Max-well, and I suppose between one or two others who were in this market and held franchises. In that sense, another level, perhaps you might call it a level above the actual selling point of chicken, you have the competition for the franchises so that you then can sell chicken. (Testimony of William Shepherd, May 1, 1985, Tr. at 12.)

Dr. Shepherd clarified this testimony on cross-examination:

Q. With respect to the product market, as I understand your testimony, the product market is spicey [sic] fast food fried chicken, is that right?

A. Spicey [sic] fast food chicken. (Testimony of William Shepherd, May 1, 1985, Tr. at 40.)

PFF produced no other evidence supporting a product market in Popeyes' franchises beyond this ambiguous testimony. Furthermore, Dr. Shepherd's testimony on this issue is without any analysis or economic support and is replete with contradictions.[9] Dr. Shepherd admits that he did not conduct any independent studies on consumer preference or price, quality and end use similarities, but formulated his opinion by reading what "was available in the record, and compared it with the broad flow of research and other materials that I have defined in the past." *Id.* at 50–51.

Finally, PFF specifically contradicted its claim that there was a relevant market in Popeyes' franchises at several points in the proceedings. For example, PFF referred to the relevant market as the "fast food spicy chicken market" in its pre-trial memorandum. In addition, PFF's counsel affirmatively represented that the relevant market was "spicy fast food chicken" in

---

8. Special interrogatories 2 and 8, which are identically worded, asked the jury "Do you find, by a preponderance of the evidence, that the relevant product market, as that term is used with respect to the antitrust laws, consists only of spicy fast food chicken?" The jury only answered interrogatory 8, which asked this question in relation to PFF's claim under § 2 of the Act, as it did not reach this issue with respect to the § 1 claim because it found that there was no conspiracy in restraint of trade.

9. For example, Dr. Shepherd refused to admit that an agreement between a franchisor and a franchisee is a vertical agreement, but then readily admitted that territorial restrictions imposed by franchisors are vertical in nature and can have pro-competitive effects. *See*, Testimony of William Shepherd, May 1 Tr. 28–38.

response to a question by the court during the charging conference. May 8 Tr. at 57–58. As such, the court was justified in any charging the jury on the "spicy fast food chicken market."

In direct contrast to Dr. Shepherd's testimony, the testimony of Gary French, an expert witness for Popeyes, on the relevant product market is well documented. Mr. French testified that the relevant product market was "fast foods at either the retailer or franchisor level." Testimony of Gary French, May 6 Tr. at 82. Mr. French based his conclusion on an extensive independent study conducted by himself and his staff. *Id.* at 88–102. Specifically, Mr. French testified that Popeyes faces competition from all fast food outlets and that there are low barriers to entry and a high degree of cross elasticity of demand in the fast food market. He also stated that there was no product market in Popeyes' franchises, and if the market were to be defined in terms of franchises, it would have to include all fast food franchises. *Id.* at 123–24.

▮ Thus, there was no substantive support for the position that there was a relevant product market in Popeyes' franchises. This conclusion is further buttressed by the fact that the jury specifically found in answer to special interrogatory 8 that the relevant market did not consist "only of spicy fast food chicken." This finding implies that the jury agreed with Popeyes that the market consisted of other fast foods as well.[10] Accordingly, PFF's challenge to the instruction on the product market is without merit.

▮ PFF also challenges the instruction on the relevant geographic market. I instructed the jury as follows:

The relevant geographic market is that area in which Popeyes encounters competition from other products in the relevant produce market. Thus, if you find the relevant product market is fast food spicy chicken, the relevant geographic market is the territory in which Popeyes competes with others for the sale to its customers of fast food spicy chicken. May 9 Tr. at 131.

PFF contends that the language "the territory in which Popeyes competes with others for the sale to its customers of spicy fast food chicken" infers that the geographic market is nationwide because Popeyes is a nationwide chain. In addition, PFF argues that this definition of the market does not comport with the test prescribed by the Third Circuit in *Pa. Dental Assoc. v. Medical Service Ass'n of Pa.*, 745 F.2d 248, 260, (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985), which defines the relevant geographic market as the area in which "a potential buyer may rationally look for the goods or services he or she seeks...." I fail to see how there is any material difference between this test and the proffered instruction. In any event, PFF's objection to the instruction is irrelevant given the jury's finding that PFF had failed to establish a relevant product market.

▮ The remaining antitrust jury instructions that PFF challenges related to monopoly, monopoly power, attempted monopolization and conspiracy to monopolize. Because the jury determined that PFF failed to establish a relevant product market, PFF cannot, as a matter of law, show monopolization, attempted monopolization or conspiracy to monopolize. *See, United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956); *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 117 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) (attempt to monopolize requires market definition); *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 103 (3d Cir.1977), *cert. denied*, 434 U.S. 909, 98 S.Ct. 69, 54 L.Ed.2d 80 (1972) (specific intent to monopolize must relate to a specific market).

---

**10.** Furthermore, Charles Maxwell of PFF admitted that he suffered a 25% loss of revenues when a Kentucky Fried Chicken opened next door. Testimony of Charles Maxwell, April 24 Tr. at 116. This also indicates that Popeyes faces competition from other fast food franchises.

Thus, even assuming arguendo that these instructions were incorrect, any error would necessarily be irrelevant and harmless.[11]

■ Moreover, many of the instructions to which PFF now objects are identical to the proposed jury instructions that PFF submitted to the court. As such, PFF cannot now complain that the court adopted some of their own proposals. Indeed, the fact that PFF even raises these objections serves only to highlight the paucity of legitimate issues raised by its post-trial motions.

■ PFF first claims that the court erred by defining monopoly as "the power to control prices or exclude competition wherever they desire to do so." May 9 Tr. at 135. PFF contends that the jury should have also been instructed that monopoly power could be found when there was an ability to restrict competition as well as exclude it. Yet, PFF used precisely the same language in its proposed jury instruction No. 44, which asked the Court to instruct the jury that they "must find they had the power to control prices or exclude competition whenever they desired to do so." Moreover, the challenged instruction comports with the definition of monopoly power enunciated by the Supreme Court on more than one occasion as "the power to control price or exclude competition." *See, e.g., United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956); *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Any assignment of error in this regard is, therefore, not only unwarranted, but clearly frivolous in light of established precedent and PFF's own proposed instructions.

■ Similarly, PFF's proposed jury instruction as to when monopoly power may be inferred because of a party's market control is identical to the one I submitted to

the jury. Both state that monopoly power may be inferred when the alleged monopolist controls more than two-thirds or 70% of the market. PFF now argues that the charge was "incorrect, misleading, and prejudicial insofar as it suggested to the jury that where the percentage of market control was less than two-thirds monopoly power cannot be inferred." PFF's Brief at 48. PFF contends that it is unnecessary to cite any cases to this effect because the cases in which monopoly power was inferred even though the percentage of market control was less that 50% are "too numerous for citation." Not only is PFF estopped from challenging the instruction because of its identically worded proposed instruction, but its pronouncement that market power may be inferred when market share is less that 50% is incorrect. Although it is true that there is no absolute floor on what percentage of market share or control must be shown to establish monopoly power, the Supreme Court has emphasized that it must be a "predominant share", and the majority of cases dealing with this issue have required a showing of at least 70%. *See, United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945); *American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946); *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

■ PFF's objection to the instruction on attempted monopolization is likewise unfounded. Not only is the instruction identical to that proposed by PFF, but it accurately states the law. PFF claims that the instruction was incorrect because the jury was told that they must find that there was a dangerous probability that Marriott would acquire 90% of the market in order to find an attempt to monopolize. This is simply an inaccurate reading of the instruction, which stated:

11. PFF did not include a claim of monopolization in its complaint, and conceded at the charging conference that it made no difference whether a monopolization charge was given. May 8 Tr. at 43. Accordingly, PFF's assignment

of error on the monopolization claim need not be discussed. At any rate, there was no error in any of the challenged instructions on monopoly, as the above discussion will demonstrate.

Certainly 90 percent of the supply is enough to constitute a monopoly.

In order to show an attempt to monopolize, there must be at least a dangerous probability that the defendant Marriott could acquire such a market share. If you find no such dangerous probability exists, then you must find for the defendant Marriott on the plaintiffs' attempt to monopolize claim. May 9 Tr. at 136.

The reference to 90% of the market was merely an example and must be read in its proper context. Thus, the instruction was not misleading.[12]

## THE BREACH OF CONTRACT CLAIM

PFF objects to several of the courts instructions regarding PFF's breach of contract claim. Specifically, PFF challenges this courts instructions as to 1) whether the contract was sufficiently definite to constitute a meeting of the minds; 2) whether the alleged contract was conditional, and if so, whether those conditions were satisfied; and 3) whether the contract was supported by consideration. PFF does not suggest that these instructions incorrectly stated the law, but rather posits that there were two separate contracts at issue, and the court's failure to distinguish between the two in the instructions was inherently confusing and prejudicial. PFF's principal contention in this regard is that the court

> incorrectly states that the plaintiff contends that it entered into a franchise option contract with Popeyes. At no time did plaintiff make such a contention. Its position was always that it entered only into a contract to enter at a later time into such a franchise option contract. PFF's Brief at 57.

PFF asserts that Popeyes breached this first contract, the contract to enter into an

option agreement at a future time, before it had ever entered into the formal option contract, and that the court's failure to make this clear in its instructions was error. PFF asserts that this error entitles them to a new trial.

PFF's peripatetic argument in support of its position that there were two contracts is a somewhat feeble attempt to overcome the fact that it never executed a formal Option Agreement with Popeyes, and ignores the fact that the jury specifically found in response to special interrogatory No. 12 that PFF and Popeyes had not agreed to be bound prior to the execution of such an agreement.[13] As noted above, the evidence clearly established that there was a four step procedure for obtaining a Popeyes' franchise, culminating in the execution of a standard Popeyes' option form. It is undisputed that Popeyes and PFF never executed the formal Option Agreement. To overcome this rather formidable obstacle, PFF now argues that there was an agreement to enter into an option agreement at a future date, and it was this initial agreement that was breached.

In light of the jury's finding, it is immaterial whether the alleged agreement is characterized as an "option contract" or as an "agreement to enter into an option contract." It is hornbook law that a contract is not enforceable unless the parties intended to conclude a binding agreement, and the essential terms of that agreement are certain enough to provide the basis for an appropriate remedy. *See, e.g., Zukoski v. Baltimore O.R. Co.,* 315 F.2d 622, 625 (3d Cir.), *cert. denied,* 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963); *Linnet v. Hitchcock,* 324 Pa.Sup. 209, 211, 471 A.2d 537, 540 (Pa.1984); *Sweeney v. Popeyes Famous Fried Chicken, Inc.,* 427 So.2d 464

---

**12.** PFF's objections to the court's instructions on conspiracy to monopolize are also unfounded. Not only are PFF's proposed instructions identical to the instruction to which PFF now objects, (See proposed instruction 51 and May 9 Tr. at 136), but the jury's finding that there was no conspiracy in response to interrogatory No. 1 precludes a finding of conspiracy to monopolize, since the former offense includes the latter.

**13.** The jury responded "no" to Special Interrogatory 12 which asked "[d]o you find by a preponderance of the evidence that plaintiff and defendant Popeyes reached final agreement that plaintiff would receive five additional franchises and intended to and agreed to be bound before reducing any agreement to a formal, written Popeyes Option Agreement and signing that formal Popeyes Option Agreement."

(La.App.1983). The jury found that the parties did not intend to conclude a binding agreement. PFF cannot circumvent this conclusion by recharacterizing the agreement at issue.

Furthermore, the special interrogatory asked the jury to consider whether there was *any* binding agreement relating to the grant of additional franchise rights to PFF. As such, plaintiff's contention that the jury was not given the opportunity to consider whether or not there was a binding agreement concerning the five additional franchises prior to the execution of the formal option contract is without merit.

Because the jury found that the parties did not intend to be bound prior to the execution of a formal option contract, they never reached the interrogatories which PFF now challenges concerning the essential elements of the contract, whether the contract was conditional, and whether there was consideration for the contract. Accordingly, any assignment of error as to these issues is necessarily irrelevant. PFF argues, however, that the courts instructions on these issues influenced the jury's decision that no agreement had been reached, and any error in these instructions therefore tainted the entire decision making process. Specifically, PFF contends that the initial contract would not have been subject to the same elements of proof as the formal option contract, and the courts failure to distinguish between the two contracts may have led the jury to hold them to the same standard. PFF's Brief at 22. As discussed below, these instructions were not only proper, but it would have been error not to so instruct the jury given the evidence introduced at trial.

The first breach of contract instruction to which PFF takes exception asked the jury to determine if there was a meeting of the minds on all the essential elements of the contract and the contract was therefore definite enough to be enforceable. The instruction also asked the jury to determine what the essential elements of the contract were. The challenged portion of the instruction reads as follows:

The contract must be complete. There must be a meeting of the minds on all the essential elements.

The plaintiff contends it entered into a contract with Popeyes to open a certain number of Popeyes' franchises within a certain territory in the Philadelphia area. You must determine what the essential elements of such a contract are. Can you have an option or an agreement without a territorial franchise without the territory being defined; can you have a contract for the number of franchises to be open without identifying the number of franchises to be open within the territory; can you have an option contract without a fixed timetable within which these franchises would be open? If you find they are essential elements, there must be a meeting of the mind with respect to those elements, and if you find that Popeyes and Mr. Maxwell acting on behalf of Philadelphia Fast Foods really did not come to an agreement with respect to any essential elements of this contract, then there can't be a contract because one side could not enforce it. If there's no agreement, one side could not enforce that contract. May 9 Tr. at 139–40.

PFF contends that this instruction confused the jury because it failed to distinguish between the two contracts, and while these factors may have been essential elements of the option contract, they may not have been essential to the first contract. PFF also claims that it was unnecessary to ask the jury whether agreement was reached with respect to the definition of the territory, the designation of the opening schedule, and the number of units to be opened because adequate specificity as to these factors was conclusively demonstrated at trial.

PFF's contentions are flawed in several respects. It is firmly established that a contract is not enforceable unless there is a meeting of the minds on the essential elements of the agreement, and the essential terms of that agreement are certain enough to provide the basis for an appro-

priate remedy. *See, Rusiski v. Pribonic,* 326 Pa.Super. 545, 474 A.2d 624 (1984). *Linnet v. Hitchcock, supra,* 324 Pa.Super. at 211, 471 A.2d at 540. However the alleged contract is labeled, it was necessary to instruct the jury as to the essential elements of a franchise agreement and the requirement of specificity in a contract because Popeyes contended that it would not have entered into any agreement relating to the extension of additional franchise rights unless it had reached an agreement with PFF on these issues. PFF itself concedes that "a contract to execute a later contract must contemplate the specific terms of the later agreement." PFF's Brief at 55. Furthermore, it defies logic that Popeyes would enter into an agreement to execute a later contract whose terms were vague and indefinite when the effect of entering into that agreement would be the same as if it had actually entered into a formal Option Agreement with PFF.

Finally, there is ample evidence in the record that supports Popeyes' contention that these were essential elements of the agreement, and there was no meeting of the minds on these issues. For example, PFF asserts that the parties had agreed upon a specified territory citing Maxwell's letter of March 24, 1983, which stated that the territory would be "the eastern portion of territory formally [sic] held by Mr. Kenneth Wall plus an extension of the southern boundary of that territory to Chestnut Street." Yet, Terrel Rhoton's letter to Maxwell states that Maxwell's $5000.00 deposit represents a "good faith deposit and will secure a yet to be determined five (5)

store area in Philadelphia, Pennsylvania." This hardly indicates that the parties had come to a meeting of the minds on a specific territory.

Similarly, PFF's contentions that the opening schedule need not be established with specificity but that a reasonable time should be implied because of the absence of any indication to the contrary conflicts with the requirement in the formal Option Agreements used by Popeyes that "time is of the essence."[14] Since there was substantial evidence that Popeyes and PFF had not agreed upon the boundaries of the franchise territory or the schedule on which the franchises were to be opened, it was necessary for the jury to determine whether a full meeting of the minds had been reached on any alleged agreement relating to the grant of franchise rights.

The second and primary instruction to which PFF takes exception required the jury to determine whether the alleged contract was a conditional one, that is, whether Popeyes required PFF to submit satisfactory financial statements and prove its ability to operate Popeyes franchises in a capable manner.[15] Contrary to PFF's assertion that the specification of these two factors as possible conditions was "tantamount to a finding by the Court as a matter of law as to the existence of conditions and as to the identity of those conditions", the challenged instruction merely asked the jury to determine if the contract was a conditional one. *See,* PFF's Brief at 59. It then identified what those conditions would be based on the evidence introduced at trial.

---

**14.** The formal Option Agreements also set forth a specific schedule for development. *See, e.g.,* Popeyes Option Agreement with PFF dated October 7, 1982.

**15.** The charge on this issue reads in pertinent part:

> *You must determine whether the contract was a conditional one.* By that, I mean before Popeyes had any duty to fulfill this obligation, plaintiff was required to send to Popeyes financial information regarding its ability to open additional franchises and to prove its

ability to operate Popeyes franchises in a capable manner.
In addition, Popeyes had to find that this financial information showed the plaintiff could satisfactorily operate additional franchises. These were two conditions which you may find that the plaintiff was required to fulfill before Popeyes had any obligation to perform its part of the contract. Popeyes did not have to perform its part of the contract unless and until plaintiff has established that he satisfied the conditions. May 9 Tr. at 141–42. (emphasis added).

■ The letter dated April 1, 1983, from Terrel Rhoton of Popeyes to Maxwell expressly conditioned the grant of the five additional franchises on the production of satisfactory financial statements. In addition, William A. Copeland of Popeyes testified that Popeyes also conditioned the grant of franchise rights on Maxwell's ability to operate the stores satisfactorily. *See,* Testimony of Copeland, May 7 Tr. at 11. This evidence shows that the conditions imposed by Popeyes applied to the grant of any franchise rights to PFF, regardless of whether that grant is characterized as a franchise option agreement, or a contract to enter into a franchise option agreement.[16] Accordingly, PFF's contrived argument that this court's failure to distinguish between the two contracts was prejudicial because the jury should have been asked to decide if these were conditions of both contracts or only of the first or second contracts must be rejected.

PFF also challenges the courts instruction on consideration. The jury was told that if PFF "could have refused to enter into a formal option agreement and obtain a full refund of the $5000.00 deposit, then you must find the plaintiff did not give anything of value and must find in favor of the defendants on the contract claim". May 9 Tr. at 142. PFF now asserts that the instruction was incorrect because the consideration it tendered was a promise to enter into a Popeyes Option Agreement, and not the $5000.00 deposit.

■ It was not error to instruct the jury to consider whether the $5000.00 paid by Maxwell to Popeyes was the consideration for the alleged contract because this was the theory on which Popeyes prosecuted the lawsuit.[17] It was not until the filing of this motion for a new trial that PFF asserted that the consideration was merely a promise to enter into a Popeyes Option Agreement. Accordingly, PFF's contention must be rejected.

## THE INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS CLAIM

■ PFF also objects to the instructions regarding its claim of intentional interference with contractual relations. Specifically, PFF contends that the court erred by instructing the jury that it must find "that Marriott's purpose was to injure or harm the plaintiff" in order to find against Marriott on the interference with the prospective contractual relations claim.[18] Not only is PFF barred from raising this objection to the instruction because it failed to raise the issue at trial, but the instruction is in accord with applicable Pennsylvania law. In *Glen v. Point Park College,* 441 Pa. 474, 477, 272 A.2d 895, 899 (1971), the Supreme Court of Pennsylvania held that the tort of interference with prospective contractual relations requires a showing that the defendant acted as he had "for the purpose of causing harm to the plaintiff." The instruction was therefore correct.

## THE ACCORD AND SATISFACTION CLAIM

PFF does not challenge the legal sufficiency of the instruction and special interrogatory on accord and satisfaction. Rather, PFF's principal contention is that the

---

**16.** Indeed, while the issue of whether or not there is an agreement is a question of fact for the jury, it is within the province of the court to determine if the contract was conditional as a matter of law. *See, National Products Co., Inc. v. Atlas Financial Corp.,* 238 Pa.Super. 152, 364 A.2d 730, 733 (1975).

**17.** In answer to interrogatory 18(e) of Popeyes' First Interrogatories to Plaintiff which asked PFF to describe "the consideration which was given to Popeyes by plaintiff", PFF answered "$5000.00". See 18(e) of PFF's Supplemental Responses to Popeyes' Interrogatories. Similar-

ly, PFF stated in both its first and second memoranda in opposition to Popeyes' motion for summary judgment that the consideration was the $5000.00. See pages 30 and 5 of the memoranda, respectively.

**18.** There can be no claim for interference with existing contractual rights because the jury found there was no contract. In addition, contrary to PFF's contention, the jury was given separate instructions on the intentional interference with actual and prospective contractual rights claim. *See,* Tr. May 9 at 144–45.

court failed to instruct the jury that if Popeyes had an already existing obligation to return the $5000.00 deposit, then it could not have been the consideration for an accord and satisfaction.[19] As the jury never reached the issue of accord and satisfaction, PFF's objection is irrelevant. Nevertheless, even if the instructions were pertinent, there was no error because PFF misconstrues the law in its assertion that the refund of the deposit was an already existing obligation and, therefore, could not be consideration for an accord and satisfaction. When there is a genuine dispute between the parties, and one side cashes a check tendered to end a dispute, an accord and satisfaction is reached. *Goodway Marketing, Inc. v. Faulkner Advertising Assoc., Inc.*, 545 F.Supp. 263 (E.D.Pa.1982); *Law v. Mackie*, 373 Pa. 212, 95 A.2d 656 (1953); *Charles X. Miller, Inc. v. Oak Builders, Inc.*, 306 So.2d 449, 451 (La.App. 1975). A dispute as to the terms of a contract or the meaning of those terms may provide the proper basis for an accord and satisfaction. *Hayden v. Coddington*, 169 Pa.Super. 174, 82 A.2d 285 (1951). Finally, payments which are admittedly due, such as partial payments by debtors, do not serve as consideration for an accord and satisfaction. *Sternbergh v. Fehling*, 396 Pa. 280, 152 A.2d 473 (1959); *Charles X. Miller, Inc. v. Oak Builders, Inc., supra*, 306 So.2d at 451.

The refund to Maxwell was not an already existing obligation in the sense that it was admittedly due. Indeed, it could only be considered an existing obligation in the sense that Popeyes was freely entitled to refund Maxwell's $5000.00 at any time prior to entry into a formal contract, and for any reason.[20] Accordingly, there was no error in this instruction.

## ESTOPPEL

PFF also challenges the courts instruction on estoppel, complaining that the court did not specify that the estoppel defense was applicable only to the non-antitrust claims, but that the language of the instruction made it applicable to all of its causes of action against Marriott.

PFF takes this instruction out of context. The estoppel instruction was delivered after the instructions on interference with contractual relations claim and long after the instructions on the antitrust claims. As such, the instruction was sufficiently divorced from the antitrust instructions so as to avoid confusing the jury.

Moreover, not only did the jury not reach the issue of estoppel, but it also did not have the opportunity to apply the estoppel instruction to any of the antitrust issues because of its finding that PFF had failed to prove either a conspiracy or a relevant market. Without proof of a conspiracy and a relevant market, PFF could not establish a violation of Sections 1 or 2 of the Sherman Act.

Finally, the estoppel claim was premised on the finding of a contract. Because the jury found that there was no contract, the estoppel instruction was irrelevant.[21]

PFF raises a host of other objections, primarily relating to the instructions on damages, the use of depositions in cross examination and the submission of the special interrogatories to the jury. These objections are completely devoid of any merit and do not warrant any further discussion.

Accordingly, the plaintiffs' motion for a judgment notwithstanding the verdict or in

---

**19.** PFF also claims that it was surprised at trial by Popeyes' assertion of the accord and satisfaction defense. This contention is difficult to believe as Popeyes raised the issue in its February 12, 1985 motion for summary judgment, and PFF briefed the issue in response.

**20.** This highlights an inconsistency in PFF's argument. If the $5000.00 was admittedly due, it could not have been consideration for the contract, the theory on which PFF originally litigat-

ed the case. In any event, there is no credible evidence to support its contention that the refund was an already existing obligation.

**21.** PFF also did not object that the wording was ambiguous or the instruction should specify its inapplicability to the antitrust claims. *See,* May 9 Tr. at 177; May 8 Tr. at 104. PFF has therefore waived any right to raise the issue now.

the alternative for a new trial will be denied.